David R. BERENT, Robert R. Bonner, Gary F. Jacobs, Jania M. Jacobs, and Joel N. Levine, individually as representatives of a class composed of policyholders who purchased single premium deposit life insurance policies from Defendants in the years 1984 to date, Plaintiffs,

v.

KEMPER CORPORATION and Federal Kemper Life Assurance Company, Illinois corporations, jointly and severally, Defendants.

No. 90–CV–70040–DT.

United States District Court, E.D. Michigan, S.D.

July 31, 1991.

Leonard Lemberg, Richard Patrich, Southfield, Mich., James Thorburn, Birmingham, Mich., Charles Porter, Bloomfield Hills, Mich., for plaintiffs.

Barbara Goldman, Susan Artinian, Detroit, Mich., Dennis Egan, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER REGARDING DEFENDANTS' TWO MOTIONS TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT AND DEFENDANTS' MOTION TO STRIKE EXHIBITS

ROSEN, District Judge.

### I. INTRODUCTION

Plaintiffs instituted this action in federal court on January 5, 1990 by filing a six-count federal securities fraud/RICO/Michigan common law fraud Complaint based upon the Defendants involvement in an allegedly fraudulent scheme involving sales of two Federal Kemper Life Assurance Company single-premium life insurance policies. The case was originally assigned to U.S. District Judge Lawrence Zatkoff, and re-assigned to this Court on July 13, 1990.

This matter is presently before the Court on two Fed.R.Civ.Pro. 12(b)(6) Motions to Dismiss Plaintiffs' First Amended Complaint, which were separately-filed by the two Defendants—Kemper Corporation and Federal Kemper Life Assurance Company ("FKLA"). Plaintiffs have filed Briefs in Opposition to both of the Motions, to which opposition Briefs Defendants have replied. Plaintiffs also filed a Supplemental Opposition Brief on July 23, 1991.

Having reviewed and considered Defendants' Motions, the parties' respective Briefs and the Affidavits and other documents annexed thereto, and having heard the oral arguments of the parties' attorneys at the July 25, 1991 hearing on this matter, the Court is now prepared to rule on Defendants' Motions. This Memorandum Opinion and Order sets forth that ruling.

## II. PROCEDURAL HISTORY

### PLAINTIFFS' ORIGINAL COMPLAINT

Plaintiffs' original January 5, 1990 Complaint in this action contained six counts, captioned as follows:

Count I: "RICO Action under 18 U.S.C. Section 1962(c)—Mail and Wire Fraud";

Count II: "RICO Action under 18 U.S.C. Section 1962(a)—Mail and Wire Fraud";

Count III: "Action under Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b–5";

Count IV: "RICO Action under 18 U.S.C. Section 1962(c)—Securities Fraud";

Count V: "RICO Action under 18 U.S.C. Section 1962(a)—Securities Fraud"; and

Count VI: "Pendent [Michigan Common Law] Claim for Fraud".

All of these Counts were predicated upon Plaintiffs' claim that Defendants misrepresented in their promotion, marketing, advertisement and sales of Defendant FKLA's "RL–3" and "RL–3SP" single premium life insurance policies that the interest rate paid in connection with these policies would be directly related to FKLA's investment results. Plaintiffs claimed that Defendants allegedly lowered the interest rates paid on the policies after they were purchased to a rate below that which FKLA itself was receiving on its investments, and that Defendants have kept the surplus interest income instead of paying more to Plaintiffs.

Plaintiffs' subsequently amended their complaint by filing a "First Amended Complaint". The First Amended Complaint—which is presently at issue—was filed in response to Defendants' previous motions to dismiss Plaintiffs' original Complaint.

Judge Zatkoff ruled on Defendants' initial motions for dismissal, and on May 7, 1990, entered a Memorandum Opinion and Order, and a Judgment dismissing Plaintiffs' Complaint in its entirety, 1990 WL 120653.

### JUDGE ZATKOFF'S RULINGS ON DEFENDANTS' INITIAL MOTIONS TO DISMISS PLAINTIFFS' ORIGINAL COMPLAINT

Judge Zatkoff found that Plaintiffs' federal securities fraud claim in Count III of their original Complaint failed to state a legally cognizable claim for violation of the Federal securities laws because he determined that "plaintiffs have failed to factually support their allegation that the insurance policies are investment contracts and securities" and "that to the extent that the specific policies in this suit are securities, they are exempted from the scope of the Federal Securities laws pursuant to Section 3(a)(8) of the Securities Act of 1933 and SEC Rule 151." [See p. 6 of May 7, 1990 Memorandum Opinion and Order.]

Further, because Judge Zatkoff determined that Plaintiffs had not stated any legally cognizable federal securities fraud claim, he determined that Counts IV and V of Plaintiffs' original complaint—which alleged RICO violations predicated upon securities law violations—failed as a matter of law, as well, because, having found that there were no securities law violations, Judge Zatkoff determined that there were no RICO securities fraud "predicate acts" to support those two counts. [See 5/7/90 Opinion and Order, p. 8.] With respect to

Count I (and Count II, as well)—which were RICO counts predicated on allegations of wire and mail fraud—Judge Zatkoff determined that since plaintiffs claims of securities fraud had no legal merit, the RICO mail and wire fraud counts also failed because use of the mails or wires is not, in and of itself, a crime without any underlying illegal fraudulent activity. [5/7/90 Opinion and Order, p. 9.]

Judge Zatkoff further determined that Count II (as well as Count V)—which alleged actions under Section 1962(a) of the RICO statute—also failed as a matter of law because that section is only applicable to injuries resulting from the *use* of racketeering funds, and not from the racketeering activity itself. [5/7/90 Opinion and Order, p. 8.]

Further, with respect to Plaintiffs' entire original complaint as a whole, Judge Zatkoff held that Plaintiffs' allegations of fraud were only conclusory and failed to satisfy the requirements of Fed.R.Civ.Pro. 9(b), which requires that fraud claims be pled with specificity. Judge Zatkoff determined that Plaintiffs failed to specifically assert whether the alleged fraud was the act of the named Defendants or one of the non-defendant agents who actually sold the policies involved, and failed to specify the time, place or context of the alleged misrepresentations. Accordingly, he dismissed all of Plaintiffs' federal law claims (Counts I–V), and dismissed Plaintiffs' pendent state-law fraud claim (Count VI) for lack of federal court jurisdiction, as well.

Lastly, Judge Zatkoff held that Plaintiffs had failed to plead any facts in their original complaint that would support any claim against Defendant Kemper Corporation, nor did they plead sufficient facts to support "piercing the corporate veil" to render Kemper Corporation liable for the acts of its subsidiary, Defendant FKLA.

## PLAINTIFFS' FIRST AMENDED COMPLAINT

Judge Zatkoff subsequently vacated his May 7, 1990 Memorandum Opinion and Order and Judgment of Dismissal because, while Plaintiffs' original complaint and the Defendants' initial motions to dismiss were being considered by the Court, Plaintiffs filed a request for leave to file an amended Complaint and submitted their proposed "First Amended Complaint" therewith. Because Judge Zatkoff had not considered Plaintiffs' proposed First Amended Complaint when he issued his May 7, 1990 rulings, Judge Zatkoff vacated the May 7 Opinion and Order and Judgment of Dismissal, and granted Plaintiffs leave to file their First Amended Complaint.

It is this "First Amended Complaint" that is at issue now.

The allegations in Plaintiffs' First Amended Complaint are not materially different from the allegations set forth in Plaintiffs' original complaint. Other than the addition of a Count VII, captioned "Pendent Claim for Mandatory Injunction," the only substantive changes/additions to the original complaint set forth in the First Amended Complaint are as follows:

(1) Plaintiffs have attached to their First Amended Complaint two exhibits. These two Exhibits are sales brochures for the Federal Kemper Life Assurance Company's "RL–3" and the "RL–3SP" single-premium life insurance policies, which are the insurance policies at issue in this case.

(2) To the introductory section of the Complaint captioned "Class Action Allegations", Plaintiffs have added two new paragraphs (paragraphs 13 and 14).[1]

---

1. Since the filing of Defendants' two new Motions to Dismiss Plaintiffs' First Amended Complaint, Plaintiffs filed a Motion for Class Certification. They also filed a Motion for a combined hearing on Defendants' Motions to Dismiss and their Motion for Class Certification. Defendants have not yet directly responded to the class certification motion; rather, they filed a Motion to hold the motion for class certification in abeyance pending the Court's ruling on the two Motions to Dismiss.

This Court has granted the Defendants' Motion to hold the class certification motion in abeyance and has denied Plaintiffs' motion for a combined hearing. Thus, for purposes of the instant Motions to Dismiss, the Court is not concerned with the addition of the two paragraphs in the "Class Action Allegations" section of Plaintiffs' First Amended Complaint.

(3) To the introductory section of the Complaint captioned, "The Defendants' Fraudulent 'Bait and Switch' Scheme", Plaintiffs have added five new paragraphs.

They have added paragraph 20, in which they allege:

The Defendants' fraudulent misrepresentations and concealment of material facts were transmitted to the named Plaintiffs and to the Plaintiff class through Defendants' own written promotional literature (Exhibit 1) and through Defendants' general agents, who were innocent and unwitting dupes, and parroted the false and fraudulent representations of Defendants.

Paragraphs 25–28 are also new. (These four new paragraphs are apparently intended to cure the lack of allegations tying Defendant Kemper Corporation to the actions of Defendant FKLA which were noted by Judge Zatkoff with reference to their original complaint.) In these new paragraphs, the new facts that Plaintiffs allege are as follows: (1) Yearly interest rates on single premium life insurance products are declared by the board of directors of Defendant FKLA; (2) Nine of the 11 members of the FKLA board of directors in 1988 were also members and a majority of the board of directors of Defendant Kemper Corporation; (3) In 1988, the secretary and treasurer of FKLA were also officers of Defendant Kemper Corporation; (4) Overall investment policy for Defendant FKLA is directed and controlled by the Finance Committee of Defendant Kemper Corporation; and (5) The invested assets and net investment income of Defendant FKLA are included and reported as part of the total assets of the parent corporation, Defendant Kemper Corporation in its annual Consolidated Balance Sheet and Consolidated Statement of Income. Plaintiffs contend that these facts establish that "Defendants are so organized

and their affairs are so conducted that Defendant FKLA is merely an instrumentality, agency, conduit or adjunct of Defendant Kemper Corporation with regard to the fraudulent "bait and switch" scheme and the activity here complained of." [Para. 28 of First Amended Complaint.]

(4) With respect to Plaintiffs' two RICO wire fraud/mail fraud counts (Counts I and II), the only "substantive" changes from the original Complaint are in paragraphs 36 and 37 of Count II. In the original complaint counterparts of these two paragraphs, Plaintiffs only directed these allegations to Defendant FKLA. Now, in their First Amended Complaint, Plaintiffs have changed "Defendant FKLA" to "Defendants" (plural).[2]

(5) The only change in Plaintiffs' securities fraud claim (Count III) allegations is the addition of the legal conclusion at the end of paragraph 39 that the "single premium life insurance contracts do not qualify for the exemption under Section 3(a)(8) of the Securities Act of 1933 (15 U.S.C. Section 77c(a)(8))".

(6) With respect to Plaintiffs' RICO securities fraud claims (Counts IV and V), Plaintiffs have made no substantive changes whatsoever in Count IV, and in Count V—as they did with Count II—Plaintiffs have only changed "Defendant FKLA" to "Defendants" (plural) in paragraphs 49 and 50. There is no substantive change with respect to Count VI, the pendent Michigan common law fraud claim.

Defendants responded to the First Amended Complaint by filing the two new Motions to Dismiss which are now before the Court for disposition. Defendants also have filed a Motion to Strike the Exhibits which Plaintiffs attached to their Briefs in Opposition to Defendants' new motions to dismiss.[3] Plaintiffs have responded to all three of these Motions.

---

**2.** In new paragraph 37, Plaintiffs have merely set out the facts which in their original complaint, they had incorporated from a preceding paragraph by reference.

**3.** The Motion to Strike was originally referred to Magistrate Judge Morgan, but upon Defendants' request, this Court withdrew the Order of Reference.

## III. PERTINENT FACTS

According to the allegations in Plaintiffs' First Amended Complaint,[4] Defendant FKLA is a wholly-owned subsidiary of Defendant Kemper Corporation engaged in selling life insurance and other insurance products through a nationwide network of independent insurance agents. At issue in this lawsuit are two specific FKLA single-premium, whole life insurance policies, known as "RL-3" and RL-3SP" policies, which were allegedly purchased by Plaintiffs, apparently at some time between 1984 and February 6, 1987.[5]

Single-premium policies differ from multi-premium or installment payment policies (which involve periodic payments over a prescribed number of years) in that they involve an initial total premium payment at the time the policy is purchased. The policies also earn interest based on the accumulated premium, less insurance costs.

This earning of interest on accumulated premiums is explained in FKLA's RL-3 and RL-3SP sales brochures (attached to Plaintiffs' First Amended Complaint as Exhibits F-1 and F-2):

> With a single premium of $5,000 or more, you purchase a completely paid up life insurance policy. You never pay another cent. But that's not the end; it is just the beginning. *After we deduct the cost to insure your life,[6] the balance of your single premium begins immediately to earn the current interest rate.* That balance and accumulated interest is your cash accumulation fund. *Out of your cash accumulation fund each succeeding year, we will again subtract your cost of insurance;* you don't have

to worry about billing notices and payment checks. Each year, your cash accumulation account continues to grow.

[Ex. F-1, p. 1. *See also*, Ex. F-2, p. 1 ("After we subtract a small amount for the cost to insure your life, the balance of your single premium immediately begins to earn the very competitive current interest rate.... In the beginning of each policy year after the first, we again subtract the small cost need to insure your life.")]

The RL-3 and RL-3SP sales brochures also set forth the rates of interest, and the changeable nature of these rates:

> We use our current mortality tables to determine current cost of insurance. Thus, our inflation-fighting current interest rate—now at 12%—keeps you ahead of insurance costs by a wide margin. *The current interest rate is guaranteed one policy year at a time. After each year, it may increase, decrease or stay the same, but we promise you that it can never drop below 4.5%.*
>
> \*    \*    \*    \*    \*    \*
>
> Both the cost of insurance and the current interest rate affect your cash accumulation and death benefit. The cost of insurance is fairly predictable; expenses can be tracked and so can mortality experience which, by the way, continues to be very positive. *Interest rates are less predictable, especially in an inflationary economy. The interest rates we apply to your policy reflect our own earning experience.... We promise you that we will keep our current interest rate competitive with prevailing interest rates throughout the*

---

**4.** Defendants accept the well-pleaded factual allegations of Plaintiffs' First Amended Complaint as true for purposes of their Motions, and the Court will accordingly so accept them, as well. However, the Court need not accept as true legal conclusions or unwarranted factual inferences. *Morgan v. Church's Fried Chicken,* 829 F.2d 10, 12 (6th Cir.1987); *Blackburn v. Fisk University,* 443 F.2d 121, 124 (6th Cir.1971) (the court is "required to accept only well pleaded facts as true, not the legal conclusions that may be alleged or that may be drawn from the pleaded facts." [citations omitted.]) Furthermore, the Court is not bound to accept factual allegations which are at variance with the express

terms of documents attached to Plaintiff's First Amended Complaint and by reference made a part thereof. *See, Olpin v. Ideal National Ins. Co.,* 419 F.2d 1250 (10th Cir.1969).

**5.** See para. 8 and 22 of the First Amended Complaint.

**6.** The "cost of insurance" is further explained in the sales brochures as "administrative expenses and [the insured's] cost as a 'mortality risk'." [See Ex. F-1, p. 1 and Ex. F-2, p. 2 (in which the "cost of insurance" is defined as "mortality and business expenses".)

*economy* .... If the interest rate goes down and the cost of insurance goes up, your cash accumulation slows accordingly; at worst, your death benefit will remain level....

[Ex. F–1, pp. 1–2. (Emphasis added.)][7]

The crux of Plaintiffs' First Amended Complaint (just as was the case with their original Complaint) appears to be their displeasure with FKLA's February 1987 decision to lower its annual renewal interest rates on all policies issued prior to March 1, 1987. Plaintiffs allege that after they purchased single-premium policies which were apparently paying first-year interest rates of 12% (for those policies purchased between July 1, 1984 and February 28, 1985) and 11.5% (for those policies purchased between March 1, 1985 and February 28, 1986) when they bought them, in February 1987, Defendants announced to Plaintiffs that as of March 1, 1987, the renewal interest rate for all policies issued prior to March 1, 1987 would be 7%. New policies issued on or after March 1, 1987 were to be paid a guaranteed first-year interest rate

of 8.25%. They claim that the 7% renewal rates were lower than the prevailing rates paid by almost all other insurance companies offering single-premium life insurance products. Thus, they allege that the Plaintiff class has lost "millions of dollars of interest", which the Defendants were able to retain themselves.

The allegations of fraudulent conduct on the part of Defendants are essentially the same as that of their original Complaint, *i.e.*, that in promoting and marketing the RL–3 and RL–3SP single-premium life insurance policies, Defendants made certain misrepresentations and failed to disclose certain facts to Plaintiffs. [See para. 17(a)–(d) of the First Amended Complaint.] In particular, Plaintiffs allege in paragraph 17(b) of their First Amended Complaint that Defendants (1) misrepresented in Exhibits F–1 and F–2 that the interest to be paid on the single-premium policies, after deduction of insurance costs, "would be directly related to Defendant FKLA's investment results"[8] but that Defendants all

---

7. In Ex. F–2, which is an RL–3SP brochure, the fluctuation of insurance costs and interest rates is explained as follows:

The cost of insurance (mortality and business expenses) is predictable. Federal Kemper Life Assurance Company's mortality experience and costs of doing business are monitored closely. Mortality experience for our entire country has been very favorable, but especially so for our policyholders. And our business expenses have always been low....
*Interest rates are less predictable. They are affected by specific financial conditions and the general state of our economy. We can tell you with confidence that our own investment and earning experience has been very good; we expect it to continue to be favorable....
We intend to keep our current interest rate competitive with prevailing rates throughout the economy.*
*Because your interest rate is guaranteed one year at a time, it is possible that the rate applied to existing policies could be higher or lower than the current declared rate offered to those purchasing RL–3SP brand new. That possibility for difference exists because of changing yields on investments from one year to another....* Be assured that we are dedicated to keeping the RL–3SP interest rate for your policy as high and as consistent as possible within the framework of our changing economy.... Regardless of what happens to the interest rate, two things are certain: (1) *Your cash accumulation will never earn at less*

*than the 4% interest rate guaranteed as a minimum in your policy;* and (2) You will never have to pay another premium dollar.
[Ex. F–2, pp. 2–3. (Emphasis added.)]

8. Although Plaintiffs *allege* in paragraph 17(b) of the First Amended Complaint that Defendants misrepresented in the RL–3 and RL–3SP sales brochures that interest paid to them on their policies "would be directly related to Defendant FKLA's investment results", this statement does not appear in any evidence or materials of record in this case. The closest that anything in either of the sales brochures comes to this complaint allegation is one statement in the RL–3 brochure, *"The interest rates we apply to your policy reflect our own earning experience;* that's why it's important with an interest-sensitive policy like RL–3 to know that the company issuing the policy is well-managed, financially sound, and has a solid reputation for prudent financial decisions" [Ex. F–1, p. 2], and one statement in the RL–3SP brochure, "We can tell you with confidence that our own investment and earning experience has been very good; we expect it to continue to be favorable." [Ex. F–2, p. 2]. Neither of these two sales brochure statements can be reasonably read to promise that interest rates paid "would be directly related" to Defendant FKLA's investment results.

along intended to retain a larger spread or share of the investment yield on the single premium funds invested by Plaintiffs and the Plaintiff class regardless of the investment results, and (2) concealed from and failed to inform Plaintiffs that the guaranteed first-year 12% interest rates from July 1, 1984 through February 28, 1985 and the guaranteed first-year 11.5% interest rates from March 1, 1985 through February 28, 1986 were higher than FKLA's average investment yields in 1984 of 10.62% and in 1985 of 10.79%.[9]

Plaintiffs claim that the only reason that Defendants were paying such high start-up interest rates on the single-premium policies was to "put the business on"; Defendants had all along intended to lower the renewal interest rate paid in succeeding years, letting them retain a larger spread or greater share of the investment yield on the single-premium funds. Plaintiffs characterize Defendants' lowering of renewal interest rates as a "bait and switch" scheme.

## IV. LEGAL ANALYSIS

Although Defendants' have captioned their motions as "Motions to Dismiss" pursuant to Fed.R.Civ.Pro. 12(b)(6), they have presented to the Court materials outside the formal pleadings in this matter. The Court has accepted and considered these additional materials and, therefore, in accordance with Rule 12(b), this Court will treat Defendants' Motions as motions for summary judgment in accordance with Fed. R.Civ.Pro. 56.

## A. THE STANDARDS GOVERNING CONSIDERATION OF A MOTION FOR SUMMARY JUDGMENT

The standards governing a trial court's consideration of motions for summary

judgment were redefined by the United States Supreme Court in three 1986 cases: *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); and *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

In the *Anderson/Celotex/Matsushita* trilogy, the Supreme Court made clear that where the non-moving party has failed to present evidence on an essential element of his case, he has failed to meet his burden and all other factual disputes are irrelevant; in such cases, summary judgment is appropriate. *Celotex, supra*, 477 U.S. at 322–323, 106 S.Ct. at 2552. *See also, Matsushita, supra*, 475 U.S. at 586, 106 S.Ct. at 1356.

The Sixth Circuit expressly adopted this "new era" in summary judgment practice in *Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir.1989), and delineated in that securities fraud/RICO case the principles extracted from the 1986 Supreme Court trilogy and their progeny that are to guide trial courts in this circuit in deciding motions for summary judgment:

1. Complex cases are not necessarily inappropriate for summary judgment.

2. Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

3. The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case.

4. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

---

**9.** According to paragraph 24 of the First Amended Complaint, these "net yield" figures are from Defendant FKLA's financial reports to the Illinois Department of Insurance or Best's Insurance Reports. However, in the absence of a specific representation of what the investment yields would be based upon, the Court fails to see the relevance of these figures because there is nothing in the chart in paragraph 24 to indi-

cate that the investments producing this net yield were the single-premium policies. Rather, these figures appear to be the investment yield of *all* of the assets of FKLA; no evidence or other materials of record establish that Defendants represented to Plaintiffs that the interest rates paid to them would be based upon the average yield of all of the assets of FKLA.

5. A court should apply a federal directed verdict standard in ruling on a motion for summary judgment. The inquiry on a summary judgment motion or a directed verdict motion is the same: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

6. As on federal directed verdict motions, the "scintilla rule" applies, *i.e.*, the respondent must adduce more than a scintilla of evidence to overcome the motion.

7. The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.

8. The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

9. The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

10. The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least

some discretion to determine whether the respondent's claim is "implausible."

886 F.2d at 1478–1480 [footnotes omitted].

The Court will decide the motions before it by application of the foregoing principles.

## B. PLAINTIFFS HAVE FAILED TO STATE A LEGALLY COGNIZABLE CLAIM OF SECURITIES FRAUD

As discussed *supra*, Plaintiffs have not made any substantive change in Count III of their First Amended Complaint in which they purport to plead Defendants' violation of the Securities Exchange Act of 1934 and SEC Rule 10b–5, other than to add a legal conclusion in paragraph 39 that the "single premium life insurance contracts do not qualify for the exemption under Section 3(a)(8) of the Securities Act of 1933 (15 U.S.C. Section 77c(a)(8))". [First Amended Complaint, para. 39.][10] As Judge Zatkoff noted at page 6 of his May 7, 1990 Memorandum Opinion and Order, a complaint containing merely "boilerplate" allegations of securities law violations in conclusory terms, without any factual allegations to support such boilerplate, conclusory allegations is legally insufficient to maintain a securities fraud action. *See, Kennedy v. Nicastro*, 517 F.Supp. 1157, 1161 (N.D.Ill.1981).

*Kennedy v. Nicastro* is, in fact, a case procedurally similar to this case. In that case, the plaintiffs had filed a complaint and then a "first amended complaint" for securities fraud which the court had dismissed on the defendants' motion, with leave to plaintiffs to replead in order to cure the complaint defects noted by the court. [*See*, the *Kennedy* court's earlier Memorandum Opinion and Order regarding the defendants' initial motion to dismiss the first amended complaint, *Kennedy v. Nicastro*, 503 F.Supp. 1116 (N.D.Ill.1980).]

**10.** The full text of paragraph 39 is as follows: "The single premium life insurance policies offered for sale and sold by Defendants to Plaintiffs and to the Plaintiff class are investment contracts and securities within the meaning of Section 2(1) of the Securities Act of 1933 (15 U.S.C. Section 77(b)(1)), and Section 2(a)(10) of the Securities Exchange Act of 1934 (15 U.S.C. Section 78c(a)(10)), because said contract involve an investment of money by Plaintiffs and the Plaintiff class in a common enterprise with a reasonable expectation of profits to be derived solely from the efforts of Defendants; and because said single premium life insurance contracts do not qualify for the exemption under Section 3(a)(8) of the Securities Act of 1933 (15 U.S.C. Section 77c(a)(8))."

The plaintiffs subsequently filed a "Second Amended Complaint", which the defendants also moved to dismiss. The court found that the plaintiffs' Second Amended Complaint was still defective, in part because the allegations in plaintiffs' claim of violation of the Securities Act of 1934 and Rule 10b–5 were "mere boilerplate, alleging violations of the securities law in conclusory terms without indicating any factual support." 517 F.Supp. at 1161.

The *Kennedy* court had explained in its Memorandum Opinion and Order dismissing the first amended complaint with leave to plaintiffs to replead,

> Where as here a complaint sounds essentially in fraud, it is necessary to reconcile the notice pleading concept of Fed. R.Civ.Pro. 8(a) with the particularity requirement of Fed.R.Civ.Pro. 9(b). *More rigorous standards are imposed in Rule 10b–5 cases for good reason. Sanders v. John Nuveen & Co.,* 619 F.2d 1222 (7th Cir.1980); *Ross v. A.H. Robins Co.,* 607 F.2d 545, 557 (2d Cir.1979).

503 F.Supp. at 1120 (emphasis added).

Because the *Kennedy* plaintiffs still failed to cure their defective securities fraud allegations in their second amended complaint, the court dismissed their federal claims with prejudice, explaining,

> This opinion has dealt with plaintiffs' third attempt to frame an appropriate complaint. Because plaintiffs have failed properly to plead claims under the securities law notwithstanding this Court's explicit instructions in [its previous] Opinion, the first five claims are dismissed with prejudice.

517 F.Supp. at 1162.

In this case, with respect to their claim of violation of the Section 10(b) of the 1934 Act and Rule 10b–5, Plaintiffs have still not alleged any factual support for their conclusory allegation in paragraph 39 that the single-premium life insurance policies at issue are "investment contracts and securities" other than to parrot the statutory/regulatory language defining a security, and to add yet another conclusory allegation that the policies are not exempt from the scope of the securities laws under Section 3(a)(8) and SEC Rule 151. As noted in note 4, *supra*, the Court is not required to accept as true legal conclusions pled in Plaintiffs' complaint. *Morgan v. Church's Fried Chicken,* 829 F.2d 10, 12 (6th Cir.1987); *Blackburn v. Fisk University,* 443 F.2d 121, 124 (6th Cir.1971).[11]

■ Insurance policies that come within Section 3(a)(8) are excluded from the antifraud provisions of all federal securities

---

11. In support of their opposition to the Motion to Dismiss, Defendants have also submitted the Affidavit of a purported Securities Law "Expert", attorney Peter Sugar, who states that based upon his review of Defendants' Motions and Briefs, "[I]t is my opinion that there is a substantial question as to whether the Contracts are "securities" within the meaning of the federal securities laws.... It is further my opinion that proper resolution of this issue requires further discovery...."

Although the Court has not stricken Mr. Sugar's affidavit, as Defendants have requested in their Motion to Strike, just as the Court is not required to accept legal conclusions asserted in Plaintiffs' Complaint, the Court is not required—and expressly refuses—to accept as support for a party's position with respect to a pending motion an Affidavit of a third-party who has no first hand knowledge of the facts of the case who offers nothing more than his personal opinion regarding the law. *See* Fed.R.Civ. Pro. 56(e) ("Supporting and opposing affidavits shall be made on *personal knowledge,* shall set forth such *facts* as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.... [T]he adverse party's response [to a motion for summary judgment], by affidavits or as otherwise provided in this rule, *must set forth specific facts showing that there is a genuine issue for trial."*)

Further, Mr. Sugar's "expert" opinion as to whether the policies in question are securities is not only an opinion on a purely legal question—which in this Court's view is solely within the purview of the Court—it is not even an "expert opinion" under Fed.R.Evid. 702, which provides in pertinent part, "If scientific, technical or other specialized knowledge will assist *the trier of fact* to understand the evidence or to determine a fact in issue, a witness qualified as an expert ... may testify thereto in the form of an opinion...." Mr. Sugar would not qualify as an expert under Rule 702 to testify to the matters stated in his Affidavit for the simple reason that his "opinion" is not offered to assist a trier of fact in determining a fact in issue, but rather is a purely "legal opinion" offered as assistance to the Court for determining the *law*—legal matters are *never* matters for the triers of fact.

laws, including Section 10(b) of the Securities Exchange Act of 1934. *See, Olpin v. Ideal National Insurance Co.,* 419 F.2d 1250 (10th Cir.1969), *cert. denied,* 397 U.S. 1074, 90 S.Ct. 1522, 25 L.Ed.2d 809 (1970) (life insurance policies are not securities under the 1933 Act, so there can be no cause of action under the anti-fraud provisions of the Securities Exchange Act of 1934); *Otto v. Variable Annuity Life Insurance Co.,* 611 F.Supp. 83 (N.D.Ill.1985), *aff'd in part, rev'd in part,* 814 F.2d 1127 (7th Cir.1986), *cert. denied,* 486 U.S. 1026, 108 S.Ct. 2004, 100 L.Ed.2d 235 (1988) (plaintiff's claims under Rule 10b–5 dismissed because the court found that the subject annuities came within Section 3(a)(8)); *Associates in Adolescent Psychiatry v. Home Life Insurance Company of New York,* 729 F.Supp. 1162 (N.D.Ill.1989) (to like effect). SEC Rule 151, 17 C.F.R. § 230.151, sets forth the requirements for exemption of insurance contracts under Section 3(a)(8).[12] First, the contract must be issued by an insurer subject to supervision of the applicable state insurance department. Rule 151(a)(1). Second, the insurer must assume the investment risk under the contract. Rule 151(a)(2).[13] Third, the contract must not be marketed primarily as an investment. Rule 151(a)(3).

In this case, the Court agrees with Judge Zatkoff's previous ruling on this issue that, contrary to Plaintiffs' new assertion in paragraph 39 of their First Amended Complaint, the policies in issue *are* exempt from the scope of the federal securities laws under Section 3(a)(8) of the 1933 Act and Rule 151. With respect to Plaintiffs' original Complaint, Judge Zatkoff found:

The defendants' insurance policies [copies of which Defendant FKLA has provided to the Court as Ex. B and C of its Appendix to the Motion to Dismiss the First Amended Complaint] are exempt because they have met certain basic requirements of Rule 151. Specifically, the Court finds that the contracts were issued by a corporation allowed to conduct business in Michigan and that corporation is subject to the supervision of Michigan's Insurance Commissioner as required by Rule 151(a)(1). (See FKLA's attached exhibit E [refiled by Defendant FKLA as Exhibit D of its Appendix], the affidavit of Donald P. Maves).

While the policy may refer to its investment abilities, its interest rates and tax consequences, Rule 151 considers whether the contract is primarily marketed as an investment. (Rule 151(a)(3)). Defendant FKLA's attached exhibits F1 and F2 [Exhibits F–1 and F–2 of Plaintiffs' First Amended Complaint] show that the policies were marketed in such a way as to emphasize the long-term insurance benefits of the policies, including the safety and stability of the policies because of the guaranteed minimum interest rates.

In this instance the insurer (FKLA) assumed the investment risk as required by the rule (Rule 151(a)(2)). In addition, the insurer has also guaranteed the principal amount of purchase payments and interest less any deductions. Furthermore, the insurer has agreed to pay a

---

**12.** Although Rule 151 is directed at "annuity" contracts, in the Securities Act Release adopting Rule 151, Sec. Act. Release No. 6645, Fed.Sec. L.Rep. para. 84,004 at 88,129, n. 4, the SEC expressly determined that Rule 151's standards were to be used in determining whether life insurance contracts fell within the scope of the exemption set forth in Section 3(a)(8):

[I]nsurers offering life insurance contracts are in the same position as those who seek to offer annuity contracts in direct reliance upon section 3(a)(8). The securities law status of a life insurance contract may be analyzed by reference to the principles discussed in Rule 151 and accompanying releases and by relevant judicial interpretation of section 3(a)(8).

**13.** With respect to this Rule 151 requirement, there are three specific "investment risk" criteria: (1) The value of the contracts must not vary with the investment performance of a separate account; (2) the insurance company must guarantee the principal amount of premium payments (net of charges) and interest credited thereto and must further specify and guarantee payment of a minimum rate of interest; and any interest credited in excess of the minimum must not be modified more frequently than once per year. As discussed *infra,* after reviewing the RL–3 and RL–3SP sales brochures and policies, Judge Zatkoff found that all three of these sub-criteria were satisfied in this case.

specified rate of interest under the contract pursuant to Michigan's nonforfeiture laws. (See policies attached to FKLA's motion to dismiss as exhibits A and B [re-submitted with FKLA's instant Motion to Dismiss the First Amended Complaint as Exhibits B and C in FKLA's Appendix].)

[May 7, 1990 Memorandum Opinion and Order, p. 7.]

As explained *supra*, Plaintiffs First Amended Complaint securities fraud allegations are not materially different from those in their original Complaint, and this Court finds that the few additional allegations in the First Amended Complaint do not take the insurance policies out of the scope of Section 3(a)(8)'s exemption.

First, it is undisputed that FKLA is an insurance company subject to the supervision of the Michigan Insurance Commission and subject to the supervision of state insurance commissions or similar agencies in all states where RL–3 and RL–3SP policies are sold. [*See*, para. 3 of the Affidavit of Donald P. Maves, at Ex. D of Defendant FKLA's Appendix]. .Thus, the policies meet the requirements of Rule 151(a)(1).

Second, all three of the "investment risk" criteria required for satisfaction of Rule 151(a)(2) are met in this case. An insurer is deemed to assume the investment risk under the contract pursuant to Rule 151(a)(2) if:

(1) The value of the contract does not vary according to the investment experience of a separate account;

(2) The insurer for the life of the contract;

    (a) Guarantees the principal amount of purchase payments and interest credited thereto, less any deduction for expenses; and

    (b) Credits a specified rate of interest[14] to net purchase payments and interest credited thereto; and

(3) The insurer guarantees that the rate of interest to be credited in excess of the specified rate will not be modified more frequently than once per year.

17 C.F.R. 230.151(b).

In this case, the value of the policies does not vary with investment results of a separate account. The net premiums under the policies are not placed in a separate account; they are commingled with the general assets of FKLA. [*See*, Maves Affidavit, para. 4.][15] Therefore, the first "invest-

---

**14.** The term "specified rate of interest" means a rate of interest under the contract that is at least equal to the minimum rate required to be credited by the relevant nonforfeiture law in the jurisdiction in which the contract is issued. If the jurisdiction does not have an applicable nonforfeiture law, Rule 151 requires that the specified rate under the contract be at least equal to the minimum rate required by the NAIC Standard Nonforfeiture Law. 17 C.F.R. 230.151(c).

**15.** Plaintiffs attempt to refute Maves Affidavit statement regarding the net policy premiums not being placed in a separate account by relying on what they represent to be excerpts of FKLA's responses to questions posed by the Illinois Department of Insurance it was required to answer with respect to its 1988 annual report. [*See*, Ex. 3 to Plaintiffs' Brief in Opposition to FKLA's Motion to Dismiss]. (The Court notes that Plaintiffs have not submitted the entire 1988 Illinois Insurance Department document; rather they have only submitted one limited set of sub-interrogatories to one Question—Question 3—and FKLA's purported answers thereto. The Court further notes that nothing on Plaintiffs' Ex. 3 bears any verification of authentication of the answers to the Question 3 sub-interrogatories as having been provided by FKLA, the particular FKLA agent who provided them or even the date thereof.)

Specifically, Plaintiffs point to the answer to sub-interrogatory 5, which asked,

State whether anticipated investment income experience factors are based on (a) a portfolio average approach, (b) an investment generation approach or (c) other. If (b) or (c), describe the general basis used, including the investment generation groupings.

The answer which Plaintiffs point to refute the Maves Affidavit is as follows,

Each major type of product that uses interest crediting rates has its own segmented asset portfolio. Existing assets are used to determine expected "renewal" rates. Expected yields on new investments are determined by our investment officers, based on current and forecasted economic conditions.

Even assuming the authenticity of Plaintiffs' Ex. 3, as Defendant FKLA noted in its Reply Brief, the SEC has expressly sanctioned segmenting portfolio assets (which is a common practice among insurance companies) and stated in Release 6645 that contracts supported by internal insurance company segmented portfolio assets satisfy Rule 151(b)(1) which requires

ment risk" criterion of Rule 151 is satisfied.

The second "investment risk" criterion is also satisfied in this case. First, it is undisputed that FKLA's policies contain guarantees of principal and interest credited thereto. [See Defendants' Appendix Exhibits B and C.] And, although as clearly stated in the sales brochures the excess interest rate may increase or decrease, it is also undisputed that the policies guarantee that at least 4% and 4½% interest will be paid annually. [*See* Plaintiffs' First Amended Complaint Ex. F–1 at p. 1 and Ex. F–2 at p. 3] The minimum 4% and 4½% rates exceeds Michigan's 3% minimum interest, M.C.L. § 500.4072(5)(a). It also exceeds the NAIC Standard Nonforfeiture Law, § 4(a)(1), which is also 3%.

The final Rule 151 investment risk criterion is that any interest credited in excess of the guaranteed minimum will not be modified more frequently than once per year. Once again, there is no dispute that the life insurance policies at issue here specify that excess interest rates will be guaranteed for full policy years. [*See* p. 10 of both Exhibits B and C of Defendants' Appendix.] The SEC specifically stated that a policy year guarantee satisfies this final criterion of the "investment risk" requirement. Release No. 33–6645 at Sec. L.Rep. 88,134–35.

Based on the foregoing, the Court finds that the FKLA policies at issue in this case satisfy the "investment risk" requirement of Rule 151(a)(2).

The last Rule 151 requirement is that the policies not be marketed primarily as an investment. Rule 151(a)(3). Judge Zatkoff found, FKLA's RL–3 and RL–3SP policies "were marketed in such a way as to emphasize the long-term insurance benefits of the policies." [May 7, 1990 Opinion, p. 7.]

Whether the policies were marketed primarily as life insurance or as an investment involves construction of the promotional sales materials, in this case Plaintiffs' First Amended Complaint Exhibits F–1 and F–2. *See, Otto, supra,* 814 F.2d at

1131; *Home Life, supra,* 729 F.Supp. at 1174. As Defendants pointed out in their Briefs and at oral argument, the RL–3 and RL–3SP sales brochures clearly emphasize the insurance protection of the policies—that they are paid up with a single premium, and provide death benefit protection and estate planning advantages. That the policies were marketed primarily as insurance is further evidenced by the facts that the sales brochures provided that the cost of the policies was less for non-smokers and in some circumstances, a physical examination was required for purchasers at specified ages. These medical requirements are certainly not things associated with a pure investment.

The Court agrees with Defendants—the facts that the sales brochures also discuss the investment features of the policies and that Plaintiffs themselves perceived the policies as investment vehicles does not change alter the conclusion that the RL–3 and RL–3SP policies were not marketed primarily as investments. These very issues were discussed in depth by the court in *Associates in Adolescent Psychiatry v. Home Life,* 729 F.Supp. 1162 (N.D.Ill.1989) ("*Home Life*"). In *Home Life,* the court determined that the fixed annuity contract at issue in that case (the "FA") met all of the requirements of Rule 151 and hence, was not a security. In explaining its determination that the FA was not marketed primarily . as a security, the *Home Life* court stated,

The Court . . . concludes that [the FA sales brochure] does not, when read as a whole, promote the FA as an investment. The document repeatedly stresses that the FA is a method of saving for retirement, with guaranteed principal, guaranteed interest and a guaranteed life income (through purchase of an annuity with the accumulated funds.) The last part of the document is a section entitled "Financial Security Assured." *Undoubtedly the document refers to the investment aspects and tax-favored features of the plan, and the court does not question that Home Life and its repre-*

that the contract value not vary with investment

experience of a separate account.

*sentatives promoted the company's investment abilities in hawking the FA. But that is simply a consequence of the FA's nature as a retirement funding vehicle; shrewd investment is necessary in order to save enough for retirement. As the Seventh Circuit noted in Otto, "[I]nvestment management is the 'life blood' of life insurance companies ... and thus it was not inappropriate for [the defendant insurer] to tout its investment experience even in relation to an insurance product." The SEC's view is the same: "[A] marketing approach that fairly and accurately describes both the insurance and investment features of a particular contract, and that emphasizes the product's usefulness as a long-term insurance device for retirement or income security purposes, would undoubtedly 'pass' the rule's marketing test.... [T]he Commission is not saying, nor has it ever said, that an insurer in marketing its product cannot describe the investment nature of the contract, including its interest rate sensitivity and tax-favored status."*

729 F.Supp. at 1174 [citations omitted and emphasis added.]

The *Home Life* court went on to address the plaintiffs' argument in that case that because the purchasers of the annuities perceived them to be investments as opposed to insurance, they *ipso facto* should be deemed to have been marketed primarily as investments:

> In the Court's view, the public perception of the FA does not control the question whether it was marketed primarily as an investment. Rule 151 does not ask how the public perceives the insurance product; it merely asks how the insurer promoted it. But even assuming that the public considered the FA an investment, the inference does not reasonably follow that the FA was promoted primarily as an investment, rather than as an insurance device for the accumulation of retirement savings. The tax law and other statutes have created incentives for the use of retirement plans; whether participants use them for investment purposes, rather than for retirement, is beyond the control of an insurers marketing efforts.

*Id.* at 1175.[16]

In sum, since the life insurance policies at issue are exempt from the federal securities laws under Section 3(a)(8) and Rule 151, there is no legal basis for Plaintiffs' claims under those laws. No rational jury could find to the contrary, and, therefore, the Court will dismiss Count III of Plaintiffs' First Amended Complaint.[17]

---

**16.** All that Plaintiffs offer to refute Defendants' argument that the RL–3 and RL–3SP sales brochures establish that there is no material fact issue that the policies were marketed primarily as life insurance, is their bare assertion, unsupported by any documents or specific facts, that the policies were marketed primarily as an investment. However, Plaintiffs "cannot rely on the hope that the trier of fact will disbelieve [Defendants'] denial of a disputed fact issue but 'must present *affirmative evidence* in order to defeat a properly supported motion for summary judgment.'" *Street v. J.C. Bradford & Co., supra,* 886 F.2d at 1479, *quoting, Anderson v. Liberty Lobby, supra,* 106 S.Ct. at 2514. *See also, Kirby v. Cullinet Software,* 721 F.Supp. 1444 (D.Mass.1989) (summary judgment for the defendant in a securities fraud case is warranted where the plaintiff essentially rests on allegations in his complaint and fails to submit any probative evidence to establish a genuine issue of material fact.)

**17.** At oral argument the Court raised the issue of the Supreme Court's recent ruling regarding the statute of limitations in Section 10(b) and Rule 10b–5 securities fraud claims in *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* — U.S. ——, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991).

As the Court stated at the July 25, 1991 hearing, it appears to the Court that even assuming *arguendo* that the insurance policies are covered by the securities laws, under *Lampf,* Plaintiffs' § 10(b) and Rule 10b–5 claim is time-barred. In *Lampf,* the Supreme Court held that Section 10(b) and Rule 10b–5 claims have to be commenced within one year after discovery of the violation and within three years after the alleged misrepresentations constituting the securities law violation were made. *Id.* at ——, 111 S.Ct. at 2782. In that case, the plaintiffs' complaints were filed more than three years after the defendants made the alleged misrepresentations upon which the plaintiffs' securities fraud claims were based, and therefore, the Court determined that the plaintiffs' complaints were time-barred.

As noted, *supra,* the Supreme Court applied the "1–and–3 years" limitations period to the

**C. SINCE THERE IS NO LEGAL MERIT TO PLAINTIFFS' SECURITIES FRAUD CLAIM, THEIR RICO CLAIMS PREDICATED ON SUCH FRAUD MUST FAIL, AS WELL**

Counts I, II, IV and V of Plaintiffs' First Amended Complaint purport to allege claims of violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.* ("RICO"). In Counts I and II, Plaintiffs allege as RICO "predicate acts", violation of the federal mail fraud and wire fraud statutes. In Counts IV and V, Plaintiffs allege Defendants' violation of the federal securities laws as "predicate acts" for those two RICO claims. For the reasons set forth *infra,* in this Section, the Court finds that all of Plaintiffs' RICO counts must be dismissed.

**1. COUNTS IV AND V OF PLAINTIFFS' FIRST AMENDED COMPLAINT FAIL TO PLEAD THE REQUISITE "PREDICATE ACTS" UNDER RICO**

In Counts IV and V of Plaintiffs' First Amended Complaint, Plaintiffs allege RICO actions pursuant to 18 U.S.C. §§ 1962(c) and 1962(a), respectively. As "predicate acts" for both of these two RICO claims, Plaintiffs' allege Defendants' violation of the federal securities laws.

However, as Judge Zatkoff found in his May 7, 1990 Memorandum Opinion and Order, Plaintiffs' failure to establish a violation of the securities laws mandates dismissal of their RICO claims alleging securities law violations as the RICO predicate acts. *See also, Cahill v. Arthur Andersen & Co.,* 659 F.Supp. 1115, 1125–1126 (S.D.N.Y. 1986), *aff'd,* 822 F.2d 14 (2d Cir.1988) ("Because plaintiff's first cause of action fails to state a claim for relief for securities fraud, the plaintiff cannot rely on this claim to establish the predicate acts necessary to sustain his third cause of action under RICO."); *Dumbarton Condominium Association v. 3120 R Street Associates Limited Partnership,* 657 F.Supp. 226, 232 (D.D.C.1987) (where the court held that because the contracts entered into between the parties were not "investment contracts" subject to the securities laws, plaintiff failed to demonstrate that defendants' activities constituted a securities fraud predicate act under RICO).

Since this Court has determined in Section B, *supra,* that the insurance policies at issue are excluded from the federal securities laws, the allegations in Counts IV and V that Defendants have violated those laws are insufficient to satisfy the predicate act requirement of RICO, and therefore, those Counts will also be dismissed.

parties before it in *Lampf,* giving the rule retroactive application. (In *James B. Beam Distilling Co. v. Georgia,* — U.S. —, 111 S.Ct. 2439, 115 L.Ed.2d 481 (1991), decided the same day as *Lampf,* the Court held that where, as in *Lampf,* the court applies a rule retroactively in one case, federal courts must apply that rule retroactively to all other pending cases and litigants. *Id.* at —, 111 S.Ct. at 2448).

Here, the alleged misrepresentations were made in Defendants sales brochures. Although not clearly stated in Plaintiffs' First Amended Complaint, it appears that Plaintiffs purchased the life insurance policies at issue between July 1984 and February 28, 1986 (See paragraphs 8, 15, 17(c)), presumably after reviewing the sales brochures containing the alleged misrepresentations upon which they purport to have relied. In paragraph 22, Plaintiffs allege that they were informed of Defendant FKLA's lowering of renewal interest rates on February 6, 1987. Ap-

plying the "1–and–3 years" *Lampf* Section 10(b) limitations period to this case, one year from the date of discovery of the violation would be one year from February 6, 1987 (when FKLA announced that it was lowering interest rates) and three years from the date of the alleged misrepresentations. (This would necessarily have had to have been before the dates on which Plaintiffs purchased the insurance. Giving Plaintiffs' allegations the most expansive reading possible, the latest of these possible purchase dates appears to be February 28, 1986.) Thus, under the most expansive reading of Plaintiffs' First Amended Complaint allegations possible, to assert a timely claim of securities fraud, Plaintiffs would have had to have filed their initial Complaint in this action, at the latest by February 28, 1989. However, Plaintiffs' original Complaint was not filed until January 5, 1990. Under *Lampf,* Plaintiffs' Count III is time-barred.

### 2. COUNTS II AND V OF PLAINTIFFS' FIRST AMENDED COMPLAINT FAIL TO PLEAD THE REQUISITE "INVESTMENT INJURY" UNDER SECTION 1962(a) OF THE RICO STATUTE

■ As in their original Complaint, Counts II and V of Plaintiffs' First Amended Complaint, contains RICO claims under Section 1962(a) of the RICO statute. Section 1962(a) proscribes "the use or investment" of any income derived from a pattern of racketeering activity "in the establishment or operation of, any enterprise" engaged in or affecting interstate commerce. 18 U.S.C. § 1962(a). As Judge Zatkoff held in dismissing the Section 1962(a) claims asserted by Plaintiffs in their original Complaint, the gravamen of a Section 1962(a) claim is an injury *directly* related to the investment or use of tainted money in the enterprise; Section 1962(a) is *not* applicable to injury from the racketeering activity itself. [*See* 5/7/90 Opinion, pp. 8–9]; *Rose v. Bartle*, 871 F.2d 331, 356 (3rd Cir.1989); *Omega Construction Co. v. Altman*, 667 F.Supp. 453, 465 (W.D.Mich. 1987). Thus, in order to state a viable Section 1962(a) claim, Plaintiffs must allege a separate and traceable injury "stemming directly from the defendants' alleged use or investment of their illegally obtained income in the [RICO] enterprise." *Craighead v. E.F. Hutton & Co.*, 899 F.2d 485, 494 (6th Cir.1990). *See also, NL Industries, Inc. v. Gulf & Western Industries, Inc.*, 650 F.Supp. 1115, 1128 (D.Kan.1986) ("[T]he plaintiff must be able to show, under [1962] (a), not only that the defendant invested illegally obtained proceeds in the enterprise, but that *this investment* caused the plaintiff's harm." [Emphasis added.]) Plaintiffs' First Amended Complaint still fails to allege such an injury.

■ In the First Amended Complaint, Plaintiffs claim that "Defendants" took the proceeds from the sales of the insurance policies, invested those proceeds in high yield investments, "and used for their own benefit a large share or 'spread' of the investment yield on such assets rather than paying or crediting [a greater amount of] interest to the Plaintiff class; and the Plaintiff class has thereby suffered an investment injury...." [First Amended Complaint, paragraphs 36–37, 49–50.] Even assuming that the proceeds from the sales of the policies were used in the operation of FKLA as alleged by Plaintiffs, Plaintiffs have still failed to allege how they were injured *"directly* from the defendants' alleged use or investment of their illegally obtained income." *Craighead, supra*, 899 F.2d at 494. The real source of Plaintiffs' purported injury is that Defendants supposedly made certain misrepresentations and failed to disclose certain facts—*not* that they were injured by Defendants investment of money generated by those actions in the operation of FKLA, the alleged RICO enterprise.[18]

In *Bhatla v. Resort Development Corp.*, 720 F.Supp. 501 (W.D.Pa.1989), the plaintiffs similarly claimed that they received an investment injury because the defendants made some misrepresentations when they sold plaintiffs some condominiums and then invested the proceeds from the sales. The court dismissed their RICO claim, explaining,

> [T]he conduct constituting a violation under § 1962(a) is not the mere receipt of money derived from a pattern of racketeering activity. Nor can a violation be premised on the investment in an enterprise affecting interstate commerce.

**18.** By virtue of Plaintiffs' incorporation of the allegations of Count I into Counts II and V, Plaintiffs have claimed the existence of two different "enterprises" in their Section 1962(a) claims. FKLA is one "enterprise" [First Amended Complaint, para. 36]; the other "enterprise" alleged is the "independent general agents" who sold FKLA products [First Amended Complaint, para. 30.] There is no allegation that there was any use of "racketeering funds" in the operation of the "independent general agent" enterprise.

Thus, there is no viable Section 1962(a) claim relating to that enterprise. Moreover, under Section 1962(a), the alleged enterprise cannot be one and the same as the person (or entity) alleged to have perpetrated the RICO acts. *See, Woodruff v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 709 F.Supp. 181, 186 (D.Neb.1989). *See also, NL Industries, supra* ("[D]efendants and the enterprise must not be the same entity.... This is the clear majority rule." 650 F.Supp. at 1150.)

Rather, the essence of the violation of § 1962(a) is the use or investment of the tainted money in an enterprise. Therefore, to have standing to assert a RICO claim under § 1962(a) an injury to one's business or property must occur *because of the investment* of tainted money in an enterprise affecting commerce, the essence of the violation.

In the instant case, plaintiffs' pleading of an injury by the investment has been simply in conclusory fashion. Plaintiffs have not shown, however an injury because of the investment of tainted money in an enterprise affecting commerce. Whether the defendants did or did not invest the proceeds from the sale of the condominiums is not causally related to the plaintiffs' alleged injury. That is, the fact that the condominiums were not what they were represented to plaintiffs when they purchased their units is not causally related to the investment of the proceeds. For this reason, plaintiffs lack standing to assert a RICO claim based on § 1962(a) against the U.S. Capital defendants.

720 F.Supp. at 508.

Thus, as Judge Zatkoff recognized in the context of Plaintiffs' original Complaint, the injury alleged is from the claimed racketeering activity, not "from the actual use or investment of racketeering income funds." [5/7/90 Opinion, p. 9.] *See also, NL Industries, supra* ("If plaintiff suffered any RICO injury (which it did not), it was the result of the defendants conducting an enterprise through a pattern of racketeering activity—a violation of § 1962(c)." 650 F.Supp. at 1150.)

Plaintiffs have not only failed to assert any causal connection between Defendants' purported investment of the proceeds of the single-premium policies and Plaintiffs' alleged injury, their § 1962(a) claims are even more fundamentally deficient for the simple reason that they have not—and, indeed, cannot—establish any underlying illegal racketeering action. As explained *supra,* to establish a § 1962(a) claim, Plaintiffs must be able to show that the defendant invested *illegally obtained* money in

the enterprise. *See, NL Industries, supra; Craighead, supra; Omega Construction Co., supra.* Since there has been no illegal activity on the part of Defendants in their promotion and sales of the single-premium policies, there can be no "illegally obtained" income from those policies.

Because Plaintiffs have not established that the income Defendants obtained from the insurance policies was "illegally obtained", and because Plaintiffs' First Amended Complaint, like their original Complaint, fails to assert any causal connection between Defendants' purported investment of the proceeds of the single-premium insurance policies and Plaintiffs' alleged injury, Counts II and V must be dismissed.

3. COUNTS I AND II FAIL TO ADEQUATELY ALLEGE THE COMMISSION OF PREDICATE ACTS OF MAIL OR WIRE FRAUD UNDER SECTION 1962(c)

As Judge Zatkoff explained in his May 7, 1990 Opinion "use of the mails or wires is not, in and of itself, a crime without any underlying illegal activity or fraud." [5/7/90 Opinion, p. 9.]

Both the mail fraud and the wire fraud statutes, 18 U.S.C. §§ 1341, 1343, make it a crime to use the mails or wires for purposes of executing any "scheme or artifice to defraud". The mail fraud and wire fraud statutes are included in RICO's definitions of "racketeering activity." 18 U.S.C. § 1961(1)(B). Thus, for Plaintiffs' Count I for a RICO wire/mail fraud violation to survive Defendants' Motion to Dismiss, Plaintiffs' First Amended Complaint must sufficiently have pled their allegations of fraud.

Noting that all of the Counts in Plaintiffs' original Complaint were predicated on allegations of fraud, Judge Zatkoff found that Plaintiffs' original Complaint in its entirety failed to comply with the requisites of Fed.R.Civ.Pro. 9(b) which requires that "the circumstances of fraud ... *shall be stated with particularity."* At pp. 9–10 of his May 7, 1990 Memorandum Opinion and Order, Judge Zatkoff explained,

This Court finds that plaintiffs' allegations of fraud are only conclusory and fail to satisfy the requirements of Rule 9(b). The complaint fails to specifically assert whether the alleged fraud was the act of the named defendants or one of the non-defendant [independent insurance] agents who actually sold the policies involved. Furthermore, the complaint fails to properly allege fraud or misrepresentation with particularity. Plaintiffs raise allegations regarding interest rates, yet nowhere in the complaint do plaintiffs specify the time, place or context of these alleged misrepresentations.... Therefore, Counts I through V are hereby DISMISSED and plaintiffs' pendent claim for fraud (Count VI) is hereby DISMISSED pursuant to *United Mine Workers of America v. Gibbs*, 383 U.S. 715 [86 S.Ct. 1130, 16 L.Ed.2d 218] (1966).

Nothing has substantively changed since Judge Zatkoff's opinion, either in the law or in the posture of this case.

Courts have repeatedly held in RICO cases alleging mail fraud and wire fraud as the "predicate acts", the underlying fraudulent activities must be pled with particularity. *See, e.g., Saporito v. Combustion Engineering, Inc.*, 843 F.2d 666, 673 (3rd Cir.1988); *Van Dorn Co. v. Howington*, 623 F.Supp. 1548 (N.D.Ohio 1985); *NL Industries, Inc. v. Gulf & Western Industries, Inc., supra*, 650 F.Supp. at 1126. Courts have, accordingly, routinely dismissed RICO actions where the plaintiffs, after having been given an opportunity to correct defective complaints, still failed to assert factual allegations stating with particularity the time, place, subject matter and the precise individuals who made the purportedly fraudulent statements.

For example, in *Bender v. Southland Corp.*, 749 F.2d 1205, 1216 (6th Cir.1984), the Sixth Circuit affirmed the district court's dismissal of the plaintiff's RICO claims because he failed to allege the time, place, and contents of the specific misrepresentations upon which he relied. In *Saporito, supra*, the Third Circuit affirmed the dismissal of a RICO complaint in which the plaintiffs failed to plead with specificity the particular persons who made the fraudulent statements upon which the plaintiffs based their action. In *Bhatla v. Resort Development Corp., supra*, after the plaintiffs had twice been granted leave to amend their complaint, they still failed to allege with specificity who made the representations upon which their RICO claims. The court, therefore, dismissed those claims.

Courts have been particularly sensitive to Fed.R.Civ.Pro. 9(b)'s pleading requirements in RICO cases in which the "predicate acts" are mail fraud and wire fraud, and have further required specific allegations as to *which* defendant caused *what* to be mailed (or made which telephone calls), and *when* and *how* each mailing (or telephone call) furthered the fraudulent scheme. *See, Bennett v. Berg*, 685 F.2d 1053 (8th Cir.1982), *cert. denied*, 464 U.S. 1008, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983); *Barker v. Underwriters at Lloyd's, London*, 564 F.Supp. 352, 356 (E.D.Mich.1983). *See also, Otto v. Variable Annuity Life Ins. Co., supra*, in which the district court found that the plaintiff failed to plead each defendant's involvement in the alleged fraud as required by Rule 9(b) and, therefore, dismissed the plaintiff's RICO Section 1962(c) count.

Plaintiffs counter in their Brief in Opposition to Defendant FKLA's Motion to Dismiss that these allegations are matters within the knowledge of Defendants, and that Plaintiffs should be entitled to pursue discovery on these issues, rather than requiring them to comply with the requirements of Rule 9(b). This proposition has been rejected by several courts. *See e.g., NL Industries, Inc. v. Gulf & Western Industries, Inc., supra:*

[Rule 9(b)'s] requirement of greater specificity is intended to protect defendants from the harm that results from charges of serious wrongdoing, and to give defendants notice of the conduct complained of. *Complaints alleging fraud should seek redress for a wrong, rather than attempt to discover unknown wrongs.*

650 F.Supp. at 1129–1130 (emphasis added). *See also, Bruss Co. v. Allnet Communications Services, Inc.*, 606 F.Supp. 401 (N.D.Ill.1985).

The allegations of Plaintiffs' First Amended Complaint have not cured the deficiencies found by Judge Zatkoff in his May 7, 1990 Opinion, *i.e.*, the First Amended Complaint, like Plaintiffs' original Complaint, "fails to specifically assert whether the alleged fraud was the act of one of the named defendants or one of the non-defendant agents". Moreover, the First Amended Complaint does not add even one new allegation which fulfills Plaintiffs' obligation to plead fraud with particularity. Furthermore, Plaintiffs have failed to set out which Defendant (or non-defendant insurance agent)[19] mailed which item or made which telephone call, nor have they given any dates of such mailings or telephone calls.

Even more fundamental, in addition to these "lack of particularity of pleading" deficiencies, in this Court's opinion, there is simply no evidence of fraud whatsoever in the RL–3 and RL–3SP brochures, which according to Plaintiffs' First Amended Complaint, contains all of the alleged "misrepresentations" upon which they purportedly relied in purchasing the insurance policies and upon which their entire lawsuit is predicated.

In order to establish an actionable claim of fraud, Plaintiffs must satisfy each of the following requisite elements:

(1) that the defendant made a material misrepresentation;

(2) that it was false;

(3) that when the defendant made it, he knew that it was false, or made it recklessly, without any knowledge of its truth, and as a positive assertion;

(4) that he made it with the intention that it should be acted upon by the plaintiff;

(5) that the plaintiff acted in reliance upon the false misrepresentation; and

(6) that the plaintiff thereby suffered injury.

*Hi–Way Motor Co. v. International Harvester Co.*, 398 Mich. 330, 247 N.W.2d 813, 816 (1976). *All* of the above elements must be found to exist; the absence of any one of them is fatal to recovery. *Id.*, 398 Mich. at 336, 247 N.W.2d 813.

Moreover, in assessing the substantive sufficiency of a plaintiff's fraudulent misrepresentation claims for purposes of a motion for summary judgment, the court is to apply the standards of Fed.R.Civ.Pro. 56 with particular fidelity because *the elements of fraud may not be presumed* but must be proven ultimately with special clarity and particularity. *Kearns v. Ford Motor Co.*, 203 U.S.P.Q. 884, 887 (E.D.Mich. 1978). *See also, Anderson v. Liberty Lobby Inc.*, *supra*, 106 S.Ct. at 2513 ("[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden.").

As explained in the text and footnotes at pages 437–38 of this Memorandum Opinion and Order, the statements in the sales brochures that interest rates applied to the policies "reflect [FKLA's] own earning experience" cannot reasonably be read—as Plaintiffs would have it—as promising that the interest rates paid on the policies "would be directly related to FKLA's investment results." Nor is there anything in the sales brochures suggesting—as Plaintiffs claim—that the interest rates would only be as high as FKLA's average investment yield on all of its assets. Moreover, the brochures clearly state in plain English that the start-up interest rates were only guaranteed for one year and that rates after the first year could go up, could go down, or could stay the same. The only promise made was that they would never go below 4.5% on the RL–3 policies, or below 4% on the RL–3SP policies, and there is no allegation that interest paid to Plaintiffs was ever below these promised minimums.

For all of these reasons, the Court finds—just as Judge Zatkoff found with

---

**19.** The Court further notes that Plaintiffs have never identified by name, office, or location the particular non-defendant independent insurance agents.

respect to Plaintiffs' original Complaint—that Plaintiffs' conclusory allegations of fraud in their First Amended Complaint fail to satisfy the requirements of Fed.R.Civ. Pro. 9(b) and Fed.R.Civ.Pro. 56. Therefore, all of the federal claims in Plaintiffs' First Amended Complaint (Counts I through V) will be dismissed with prejudice, and Plaintiffs' pendent state law fraud and mandatory injunction claims (Counts VI and VII) will be dismissed pursuant to *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).[20] Defendants' Motion to Strike Plaintiffs' Response Brief Exhibits will be denied as moot.

## V. CONCLUSION

For all of the reasons stated in this Memorandum Opinion and Order, and the Court being otherwise fully advised in the premises,

NOW, THEREFORE, IT IS HEREBY ORDERED that Plaintiffs' First Amended Complaint be, and hereby is, DISMISSED in its entirety.

IT IS FURTHER ORDERED that Defendants' Motion to Strike Exhibits is hereby DENIED as MOOT.[21]

---

**20.** This ruling makes it unnecessary for the Court to address the additional arguments raised by Defendant Kemper Corporation in its separately-filed Motion to Dismiss, in which this one Defendant argues that the allegations directed at Kemper Corporation in the First Amended Complaint, like the allegations in Plaintiffs' original Complaint, do not adequately allege Kemper's direct participation in the alleged fraud nor do they justify application of piercing the corporate veil so as to hold Kemper Corporation liable for any actions of its subsidiary, Defendant FKLA.

**21.** The Court's ruling on the Motions to Dismiss also moots Plaintiffs' July 2, 1991 Motion and Brief for Order Authorizing Video Deposition and Defendants' July 11, 1991 Motion for Stay of Discovery.