**Mary Lee BRADY, Ph.D., Plaintiff,**

v.

**John DiBIAGGIO, in his official capacity as President of Michigan State University, and Lawrence D. Owen, in his official capacity as Chairman of the Board of Trustees of Michigan State University, Defendants.**

No. 5:90–CV–80.

United States District Court, W.D. Michigan, S.D.

May 6, 1992.

Malik Hodari, Hodari & Associates, P.C., William B. Hankins, Jr., Hankins, Lange & Hodari, P.C., Lansing, Mich., for plaintiff.

Michael J. Kiley, Mary E. Kurz, Michigan State University, East Lansing, Mich., for defendants.

## OPINION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

MILES, Senior District Judge.

This case, filed on September 14, 1990, arises out of plaintiff Mary Lee Brady's employment with Michigan State University ("MSU"). In her eight-count first amended complaint, Brady asserted claims based on the defendants' failure to reappoint her to an administrative post within the University.

In her first amended complaint, filed on December 4, 1990, Brady stated various federal and state statutory, constitutional, and common law claims ranging from racial and gender discrimination to breach of contract and constructive discharge. On August 2, 1991, upon a motion by the defendants to which Brady did not respond, the court dismissed all but two counts of the first amended complaint as barred by the Eleventh Amendment. The remaining two claims allege racial and gender discrimination in violation of 42 U.S.C.A. § 2000e–2(a)(1) (West 1981). The defendants have moved for summary judgment on these remaining claims. Brady has opposed the motion.[1]

## FACTUAL BACKGROUND

Some of the facts alleged in the first amended complaint are undisputed. Brady, a 63 year-old black woman who possesses a doctorate degree in clinical psychology and organizational development, was initially employed as an Assistant Professor at MSU's Colleges of Human and Osteopathic Medicine in 1972. In 1978, she received tenure, and was promoted to the position of

---

1. The defendants filed their motion on October 28, 1991. After requesting a number of extensions of time to respond to the defendants' motion, on December 28, 1991, Brady filed an untitled pleading which opposes the motion. She has not asserted the need for any additional discovery.

Associate Professor. Her duties in this position included conducting research and counseling patients, for which she received compensation in the form of a salary, supplemented by counseling and consulting fees.

In 1972, MSU instituted a faculty grievance mechanism, known as the Interim Faculty Grievance Procedure ("IFGP"). The IFGP is administered by a Faculty Grievance Officer ("FGO"), whose responsibilities include settling grievances between faculty members and University departments and units. The FGO is appointed by the President of MSU, with the approval of the Board of Trustees, based on the recommendation of the University Committee on Faculty Affairs ("UCFA"). The IFGP provides that "[a]t intervals not to exceed 5 years, the UCFA shall review the desirability of continuing the appointment of the FGO." (First Amended Complaint, hereinafter "AC," ¶ 43; Defendants' Brief, Ex. 1, ¶ 2.2.1.1). No particular method for conducting this review is prescribed in the IFGP.

Brady was appointed to the FGO position and assumed her duties on August 1, 1983. Though she assumed this administrative post, she retained her academic post and tenure in the College of Human Medicine's Department of Obstetrics and Gynecology, continuing her duties in that position in addition to performing her duties as FGO. However, although Brady continued to produce scholarly works during her term as FGO, her patient consultations and teaching schedule were progressively reduced due to the FGO office caseload.

Brady's term as FGO was to expire on August 31, 1988. AC ¶ 63. Though she had expressed her intention and desire to continue her appointment as FGO, she was not reappointed. On May 20, 1988, the UCFA advised Brady that by unanimous vote they were going to recommend to MSU President DiBiaggio that she not be reappointed for a second term. The UCFA's decision was derived, at least in part, from consideration of the results of a faculty survey undertaken by the committee in January, 1988. (AC ¶ 53, Brady Dep.

at 10–11). Brady was provided with a detailed explanation of the bases for UCFA's recommendation. (Plaintiff's Brief, Attachment 3). President DiBiaggio and Chairman of the Board of Trustees Lawrence Owen ultimately accepted this recommendation. Brady's term as FGO was extended to December 31, 1988 so that she could resolve as many outstanding grievances as possible before her successor took office.

Although Brady was aware that she could resume her faculty duties in the College of Human Medicine upon the completion of her FGO term, she did not consider this to be a viable option, for various reasons. In lieu of returning to her regular faculty position, Brady reached an agreement with the University which allowed her to take early retirement after completion of a research project. (AC ¶ 72). Brady retired from MSU in May, 1990.

## ANALYSIS

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). The plain language of Fed.R.Civ.P. 56(c) mandates the entry of summary judgment, after adequate time for discovery, "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552. One of the principal purposes of Rule 56 is "to isolate and dispose of factually unsupported claims[.]" *Id.* at 323–24, 106 S.Ct. at 2552–53.

Cases involving questions of motive or intent " 'are normally not suited to disposition on summary judgment.' " *Shah v. General Elec. Co.,* 816 F.2d 264, 271 (6th

Cir.1987) (citing *Locke v. Commercial Union Ins. Co.*, 676 F.2d 205, 207 (6th Cir. 1982) (Jones, J., dissenting)). "Nonetheless, '[w]hile the factual disputes involved in most Title VII suits preclude their resolution on summary judgment, summary judgment is available in an appropriate Title VII case.'" *Id.* (citation omitted).

The defendants argue that they are entitled to summary judgment on Brady's two remaining Title VII claims because there is no genuine issue of material fact for trial that Brady suffered no adverse personnel action and that the decision not to reappoint her as FGO was untainted by gender or racial considerations.

■■■■ Title VII forbids an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, *because of* such individual's *race*, color, religion, *sex*, or national origin[.]" 42 U.S.C.A. § 2000e–2(a)(1) (West 1981) (emphasis added). In the ordinary case, an inference of discrimination arises after the plaintiff has made a prima facie showing of discrimination under Title VII. *Cesaro v. Lakeville Community School Dist.*, 953 F.2d 252, 254 (6th Cir.1992). Once the plaintiff establishes her prima facie case, the employer must then rebut the inference of discrimination by articulating a legitimate nondiscriminatory reason for its action. The final burden of persuasion remains on the plaintiff to show that the reasons offered by the employer were not legitimate, but were a pretext for discrimination. *Id.* (citing *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981)).

■■■ The vast majority of the defendants' brief in support of their motion for summary judgment is devoted to their argument that Brady suffered no adverse personnel decision because she was not constructively discharged from her tenured position with the University, given her early retirement which was, by all indications at the time, voluntary. Brady disputes this characterization, arguing that a question of fact exists as to whether her retirement was voluntary.

Brady claims that her nonreappointment to the FGO position "forced" her to accept the University's offer of early retirement and therefore was in essence a constructive discharge from her tenured faculty position. AC ¶s 73, 101. This claim is based on the embarrassment caused by her nonreappointment to the FGO position (Brady Affidavit ¶ 3) and on her concerns about her ability to resume her medical school faculty duties full-time after a 5½ year stint as an administrator. (Brady Affidavit ¶ 1) The defendants have presented evidence showing not only that Brady's decision to retire was voluntary [2], but also that her concerns about resuming her regular faculty duties were purely subjective and speculative.[3] Under the circumstances, she has not established a genuine factual issue of constructive discharge.[4]

---

**2.** On May 21, 1988—one day after being informed that the UCFA was not going to recommend her reappointment—Brady wrote a letter to Associate Provost Lou Anna K. Simon expressing her plans for retirement in the following unambiguous terms:

> ... In my haste to terminate the conversation yesterday for fear I'd fall completely apart, I forgot to tell you that **I will become eligible to retire May 11, 1990, and would only have planned to be in the FGO position for approximately eight more months.** May 11, 1989 would become the year for which I would apply for consultantship.
>
> So not only was I *devastated* by what I perceive as very unfair and prejudicial treatment. But, also that the timing was so lousy.

(Brady Dep. Ex. 28) (boldface emphasis supplied).

**3.** Brady admitted at her deposition and in her first amended complaint that she never discussed her concerns with any member of the University staff. (Brady Dep. at 87–89, AC ¶ 70). Although Brady has submitted an affidavit in response to the defendants' motion in which she attempts to controvert these admissions ("it has come to my attention that I did in fact discuss with someone the possibility of returning to the College of Human Medicine"), her affidavit is insufficient to create a genuine issue of fact on this question. *Biechele v. Cedar Point, Inc.*, 747 F.2d 209, 215 (6th Cir.1984).

**4.** "A finding of constructive discharge in this circuit requires an inquiry into both the objective feelings of an employee, and the intent of the employer. A constructive discharge exists if 'working conditions would have been so difficult or unpleasant that a reasonable person in

Although evidence that Brady was constructively discharged is lacking, however, the failure of this aspect of her claim does not fatally affect her Title VII case against the defendants. Brady need not have been constructively discharged in order to state a claim under Title VII. Title VII prohibits not only discriminatory *discharges* but discrimination against any individual "with respect to his compensation, *terms, conditions, or privileges of employment* [.]" 42 U.S.C.A. § 2000e–2(a)(1) (emphasis added). *See Hishon v. King & Spalding*, 467 U.S. 69, 77, 104 S.Ct. 2229, 2234, 81 L.Ed.2d 59 (1984) ("[t]he benefit a plaintiff is denied need not *be* employment to fall within Title VII's protection; it need only a term, condition, or privilege *of* employment").

■ Brady's administrative assignment as FGO was subject to change at any time, according to the University's Faculty Handbook. (Defendants' Brief, Ex. 2, p. 108). However, notwithstanding that her reappointment to the position may have been nothing more than a privilege of which she could have been deprived for no reason at all, she could not be deprived of the privilege for prohibited, discriminatory reasons. This is true even though her salary may have remained the same after she was denied reappointment. Thus, Brady's Title VII claim is not deficient even though evidence that she was constructively discharged is lacking.[5]

■ A plaintiff generally must meet her initial burden of establishing a prima facie case of discrimination by showing (1) that she is a member of a class protected under Title VII; (2) that she was qualified for a position which the employer was seeking to fill; (3) that she was rejected for the position; and (4) that the employer continued to seek someone to fill the position. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). A slightly different test is, however, typically applied in discharge situations or, as in this case, in situations not involving a simple failure to hire. *Shah*, 816 F.2d at 268.[6] In this case, the plaintiff must show that she was "qualified" to continue in the position in the sense that she was able to satisfy her employer's legitimate expectations for her performance. *See Loeb v. Textron, Inc.*, 600 F.2d 1003, 1013–14 (1st Cir.1979) (where complaint stems from firing rather than hiring, showing that plaintiff was "qualified" required plaintiff to establish that he was performing his job in a manner that met employer's legitimate expectations, thus ruling out the possibility of inadequate job performance).

■ The parties do not dispute Brady's protected status and her expressed desire for reappointment. The parties also do not dispute that someone else filled the FGO position after Brady's departure. The parties do, however, dispute the reason for Brady's nonreappointment. The defendants claim that the reason for Brady's nonreappointment was that "Plaintiff had proved she was not well suited, i.e., qualified, for the FGO position." They have documented Brady's alleged unsuitability for the position in a series of events which caught the attention of University groups and officials.

the employee's shoes would have felt compelled to resign.'" *Yates v. Avco Corp.*, 819 F.2d 630, 636–37 (6th Cir.1987) (citations omitted). Brady knew that her administrative assignment and its accompanying salary increment were not permanent, and she knew that she retained her academic rank and tenure in the medical school. A reasonable person in her shoes would not have felt compelled to resign upon being informed that she would have to resume her regular duties as a member of the faculty of a State university medical school.

5. Although the lack of a constructive discharge does not defeat Brady's Title VII claim, the lack of a constructive discharge would be highly relevant to the question of backpay and reduced pension benefits. *See Gomez v. Great Lakes Steel Div. Nat'l Steel Corp.*, 803 F.2d 250, 256 (6th Cir.1986) (inability to establish an actionable constructive discharge defeats claim for losses directly attributable to voluntary decision to retire).

6. As the Court recognized in *McDonnell Douglas*, "[t]he facts will vary in Title VII cases, and the specification ... of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations." 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13.

The first example given by the defendants occurred in September, 1985. Brady, who had written the University Counsel Leland Carr in order to ask his legal opinion on certain documents pertinent to a grievance, wrote to the Assistant Provost Robert Banks to complain about the response she had received from Carr. In her letter to Banks, she complained of Carr's "high-handed behavior," characterizing it as "totally inappropriate." She stated that she did not intend "to be the recipient of such uncalled for insults." She also concluded her letter by asking Banks to "suggest some other source for legal counsel here on campus." Brady included copies of her correspondence with Carr. A review of this correspondence suggests that Brady strongly overreacted to Carr's response. (Brady Dep. Exs. 11–14).[7]

The second example given by the defendants occurred in early 1986. On February 26, 1986, Brady wrote to a grievant, Professor Christine Amsler, who had decided to withdraw a grievance. Brady was irritated that Amsler had not communicated with her directly about the withdrawal:

I am writing to express my distress that I learned of your rescindment of your grievance via a copy of a letter to President DiBiaggio. A direct communique to this office would have been in order.

You and others urged this office to move forward posthaste in preparation for a grievance panel.... approximately 40 individual schedules had to be coordinated for the initial hearing ...

... This kind of behavior does nothing but perpetuate stereotype comments about adle-brained [sic] females.

This office exists solely for the purpose of preserving the Interim Faculty Grievance Procedure and any misuse of our facility to bear pressure on any other unit on this campus will not be tolerated.

Should matters not go well for you in the future at this University, this office is going to have a great deal of difficulty believing you approach us in good faith.

(Brady Dep. Ex. 15). Later, after Amsler decided to reinstitute her grievance, Brady withdrew her remarks:

Let me assure you that I am (and was) sympathetic to your concerns.... If you recall, my last communication with you expressed annoyance. That irritation stemmed from my conviction that this office strives to be neutral and fair.... in good faith I wish to rescind my letter to you dated February 26, 1986.

(Brady Dep. Ex. 16). Brady's earlier chastising letter to Amsler was apparently passed on to the Women's Advisory Committee to the Provost ("WACP"). The Committee's chairperson wrote to Brady, essentially scolding her for her "injudicious" behavior:

... [W]omen and minority faculty members in the tenure and promotion process often do not receive the support and encouragement they deserve ... Often this 'chilly' climate puts [them] at a significant disadvantage ... For this reason it is essential that the Faculty Grievance Officer possess and express great sensitivity and understanding in dealing with those who elect to adjudicate problems through inherently adversarial proceedings such as a grievance....

In the view of the WACP your letter reflects a most injudicious course of action and is not in keeping with the responsibilities inherent in your role as Faculty Grievance Officer. At a time when Professor Amsler most needed sensitive support and help from you, she received a letter which could be interpreted as both insulting and threatening. Instead of condemning her action, the Faculty Grievance Officer should act as a helpful and neutral administrator, facilitating the grievance process....

---

7. Carr had simply stated that he was "confus[ed] ... as to why the FGO should require these interpretations, since the IFGP contains its own process for adjudication." In her deposition, Brady stated that she perceived Carr's response as an "attack" because it "wasn't too complimentary." (Brady Dep. at 77).

670

(Brady Dep. Ex. 17). Brady, apparently not content to leave well enough alone, wrote a letter further ingratiating herself with the WACP:

> ... I must hasten to remind you that the matters concerning the individual mentioned in your letter are strictly confidential. Since the FGO has not discussed them with anyone not involved in the conflict, I am non-plussed as to how you or any of your committee, not knowing the facts, could set any judgment. The [WACP], which I hold in high esteem, might better examine the etiology of 'chilly climates' for women and minorities rather than misusing the power to personalize your individual concerns. In other words, if you can't be a part of the solution, please refrain from being part of the problem.

(Brady Dep. Ex. 18).

The third example of Brady's behavior given by the defendants occurred in May, 1986, when Brady wrote the following letter to Professor Lloyd Schneiderman, Chair of the Department of Pediatrics, who was the respondent in a pending grievance:

> Dr. Mahoney [the grievant] has recently discussed a matter with me that has caused great concern. I must caution you that irrespective of how annoyed you may be with the grievant, it is a serious violation of his rights to continue stonewalling and harassing him.
>
> It is my understanding that the following series of events ... is a grave violation of his faculty rights.

(Brady Dep. Ex. 19). Four months later, Schneiderman, who became embroiled in a dispute with Brady after requesting that she retract her remarks, wrote a letter to Assistant Provost Banks complaining that Brady's actions showed bias [8]:

> ... I feel that Dr. Brady's behavior and entire method of handling this situation has been inappropriate for the faculty grievance official.... As a matter of redress, I would ask that Dr. Brady be

required to notify Dr. Mahoney in clear language that the statements in question have been withdrawn. In addition, this adversarial situation with the faculty grievance official puts me at a disadvantage in regard to the grievance in question, and I ask that Dr. Brady be replaced as the official in charge of the grievance.

(Brady Dep. Ex. 20). Again, apparently not content to leave well enough alone, Brady authored the following letter to Schneiderman:

> ... You cannot imagine how pleased I am to respond to an inquiry of this nature as I have been keeping both the Provost's Office and the University Committee on Faculty Affairs apprised on this problem since the inception of my tenure. Those with whom I have shared my concern know that I am not the only FGO who has complained of uncooperative behavior on the part of particular administrative unit heads....
>
> If you believe after [sic] three years of attempting to obtain basic perfunctory data commonly kept in any administrator's office portrays a 'certain bias and violates being neutral,' so be it....
>
> Your behavior in this instance is most regrettable.... I am respectfully requesting your cooperation, and hope that you can constrain your impetuous behavior in the interest of *fair play*.

(Brady Dep. Ex. 21). In her deposition, Brady volunteered that she had written "some kind of apology" to Schneiderman, but stated that she had only done so after being "harassed" by Scott to do it. (Brady Dep. at 75, 81–82).

Another event which caught the attention of University officials occurred on June 4, 1987, when journalism Professor Robert Alexander wrote to Brady complaining about a long delay in the handling of a grievance appeal:

8. The IFGP provides that "[t]he FGO shall not serve as advocate for any party on any griev- ance." Defendants' Brief, Ex. 1, ¶ 2.2.10.3.

The delay of the grievance appeal for which our group of six has been waiting for over a year is causing personal concern. One of our group who initiated a grievance has already retired and my retirement appears imminent.

(Brady Dep. Ex. 22). Alexander sent a copy of his letter to (among others) DiBiaggio, Provost Scott, and Assistant Provost Banks.

These events were not the only occurrences which caught the attention of University officials. In both 1986 and 1987, Brady prepared unsolicited "self evaluations" which she submitted to the UCFA Personnel Subcommittee, the group responsible for reviewing her performance as FGO. (Brady Dep. Exs. 3 and 4). These documents are rife with errors in grammar, punctuation, and spelling, and are at times incomprehensible. They impart of negative impression of her written communication skills.

Brady also made a number of provocative statements in her self evaluations. In particular, in her 1987 self evaluation Brady listed as an "issue of concern" a "conflict of interest" of the Provost, due in part to his authority to negotiate her salary as FGO. She also referred to the Provost's Office as a "Kangeroo Court [sic] where I have been forced to apologize, justify and be humiliated for having protected the integrity of the IFGP." These comments generated responses from both Provost Scott (Brady Dep. Ex. 5) and the UCFA Personnel Subcommittee. (Brady Dep. Ex. 6). Provost Scott indicated his "surprise" that Brady had not raised her concerns directly with him. He scheduled a meeting with Brady for June 5, 1987, which she cancelled at virtually the last minute "due to unforseen circumstances." (Brady Dep. Ex. 7).

Two months later, on August 4, 1987, Brady finally met with Scott and members of the UCFA. This meeting, which she deemed "unproductive," prompted her to formally request that the UCFA review her performance as FGO. Brady made her request in an August 6, 1987 letter to Dr. Ann Harrison, chairperson of the UCFA Personnel Subcommittee. (Brady Dep. Ex. 8). In her letter, Brady also made vague and unsubstantiated accusations of racism and sexism:

> After Tuesday's unproductive meeting with the Provost, I believe it is in my best interest to have an evaluation of my performance as FGO in writing as soon as possible. For the last four years I have requested such a document, and as yet none has been forthcoming. I am particularly concerned about the Provost's critical and punitive measures toward me since July 1986, and I do not intend to be victimized any more than I already have experienced. I intend to clear the air by fall, and am prepared to exercise any measures it takes toward that end.
>
> I have just about completed my documentation, and can clearly demonstrate a strong case of harassment. Though I am not yet ready to address the issue of racism and sexism, I am certainly close.[9]

When asked in her deposition what she meant by Scott's "critical and punitive measures" against her, Brady gave the following explanation:

> I felt that private conversations that I would hear about from the Provost that he entertained with these so-called recalcitrant administrators was unfair, particularly when the grievance was going on. Instead of his suggesting that whatever recourse he, as the Provost, would take be taken [sic] upon completion of the grievance, he would call me at home, he would call me at the office to explain myself, to explain my behavior, and I felt that there was no advocate for me.... This became an ongoing process of the

---

9. Later, Todd Simon, chair of the UCFA Personnel Subcommittee, explained that in making its recommendation not to reappoint Brady, the UCFA had considered the fact that Brady had made "written allegations concerning individuals and groups without supporting materials." (Brady Dep. Ex. 24).

Provost lending ear to complaints during the grievance process, and presuming that I was wrong and they were right.

(Brady Dep. at 67–68).

In February, 1988, Todd Simon, chair of the UCFA Personnel Subcommittee, wrote to Brady in anticipation of a planned meeting to discuss her performance. (Brady Dep. Ex. 23). He listed a number of subjects for discussion at the meeting. One of these subjects was the subcommittee's "concern that the grievance process takes a long time." He proposed that Brady be prepared to discuss "how workload, and the nature of the process itself, affect the lengths of time needed to resolve grievances." In her deposition, Brady stated that she perceived this inquiry as "harassment because this was discussed on a regular basis[.]" (Brady Dep. at 83). Simon also asked Brady to be prepared to respond to "comments indicating that the FGO's office is locked and inaccessible." In her deposition, Brady admitted that she always kept the FGO office door locked, but she said she found Simon's inquiry to be "inane" because no one from the subcommittee had ever come to the office to find out why the door was locked.[10] Simon enumerated Brady's unresponsiveness in interactions with the UCFA and its Personnel Subcommittee as one of the bases for the recommendation not to reappoint her as FGO. (Brady Dep. Ex. 24).

The defendants have substantiated these circumstances which precipitated Brady's nonreappointment. Brady does not deny that these events took place, nor does she bother to dispute the defendants' characterization of certain of her actions as showing her to be "unsuitable" for the FGO position. The FGO position required a person having the qualities of fairness, the ability to remain neutral, and clarity in verbal and written skills, among other things. (Brady Dep. at 28). The factual submissions by the defendants depict Brady as someone who is contentious, easily offended, and at times unable to express herself clearly. Under the circumstances, particularly inasmuch as Brady has not pointed to facts indicating otherwise, the evidence shows that she will be unable to establish a necessary element of her prima facie case—that she was able to satisfy her employer's legitimate expectations and was therefore "qualified" to continue in the FGO position.

■ Even if Brady had established all the elements of a prima facie case, however, the defendants have proffered a legitimate, nondiscriminatory reason for her nonreappointment—that Brady was perceived as ill-suited to play the role of facilitator in resolving disputes. The evidence submitted by the defendants substantiates this perception. Brady may, however, demonstrate that her employer's proffered reasons are pretextual by showing "that a discriminatory motive more likely motivated the employer, or that the reasons given are unworthy of belief." *Irvin v. Airco Carbide*, 837 F.2d 724, 726 (6th Cir.1987).

■ Brady has failed to make a showing of discriminatory motive. All of her predecessors and successors in the FGO position have been white males. (Brady has alleged that only eight persons have occupied the FGO position since its inception in 1972.) However, Brady admits that she held the position longer than any of the others.[11] Brady has not, in her response to the defendants' motion, pointed to any specific facts which support an inference that

---

**10.** Brady also volunteered that she had "inherited the locked door," and that she presumed that "this was appropriate grievance office behavior because of the confidentiality of the records." (Brady Dep. at 83). However, when asked whether other University offices which maintained confidential records kept their doors locked, Brady changed her explanation, stating she kept the door locked at her secretary's insistence because "we were the only two females in an empty building on that end." (*Id.*).

**11.** Dr. C. Patrick Larrowe, who served second longest as FGO, occupied the position for less than four years. AC ¶ 26. Larrowe was also appointed as an interim successor to Brady. (Brady Dep. Ex. 25).

she was treated differently or less favorably than other FGO's who had comparable qualifications or work records. Indeed, in her response to the defendants' motion, Brady has pointed to only one fact which she claims shows discriminatory motive—that she was the only FGO to be reviewed by the UCFA. However, the facts show that Brady herself *demanded* that the UCFA provide her with a written evaluation of her performance, even though she was aware that the committee had never in the past given written evaluations. (Brady Dep. at 72–73).[12] Moreover, her demand, as evidenced in her August 6, 1987 letter to Dr. Harrison, was accompanied by a thinly veiled threat of legal action if the committee did not accede to her demand. (Brady Dep. Ex. 8). Under the circumstances, the committee's compliance with her demand does not demonstrate an intent to treat her differently because of her race or gender.

In the absence of evidence of a discriminatory motive, therefore, Brady must present some evidence which tends to show that the reason given for her non-reappointment is not worthy of belief. *Id.* This she has not done. The only "fact" to which Brady points as suggestive of pretext is that the faculty survey used was "too flawed to form even a partial basis for the UCFA's personnel decision." [13] Assuming arguendo that Brady will be able to establish at trial that the survey was not only flawed but intentionally so, Brady still has yet to refute the plethora of other evidence showing that the UCFA had a great deal of reason to perceive her continued service as undesirable. Inexplicably, Brady even chooses to ignore evidence which she herself has submitted clearly showing that the survey did not form the sole basis for the UCFA's recommendation.[14] Brady's refusal to acknowledge the additional justification for the UCFA's recommendation—and her resulting failure to rebut it—leads the court to conclude that she has failed to establish a genuine issue of material fact as to whether the reasons given for the recommendation were a pretext for discrimination.

In failing to rebut the reason given by the defendants, Brady appears to misappre-

12. The IFGP provided for review of the FGO's continued appointment at intervals not to exceed five years. Brady was the only FGO ever to have served over four years; this undisputed fact may also explain why she was the only FGO ever reviewed.

13. Brady has submitted the affidavits of two purported experts, Dr. Cloyzelle K. Jones and David J. Kallen, Ph.D., who conclusorily describe the survey as "hopelessly flawed" and "totally inadequate" respectively. The court declines to accept these affidavits, for a number of reasons, principally based upon Fed.R.Civ.P. 56(e), which requires that supporting and opposing affidavits submitted with respect to a summary judgment motion "shall be made on *personal knowledge,* shall set forth such *facts* as would be *admissible* in evidence, and shall show affirmatively that the *affiant is competent* to testify to the matters stated therein...." (emphasis supplied). *Berent v. Kemper Corp.,* 780 F.Supp. 431, 440 n. 11 (E.D.Mich.1991). Both affidavits are not only not based on personal knowledge; they give mere conclusions and opinions. More importantly, however, the qualifications of these "experts" are not given in their affidavits. Dr. Jones conclusorily states that she has "particular expertise in the area of discrimination in higher education and race relations in higher education." Even if Dr. Jones could qualify as an expert in these areas, however, some of her opinions do not appear to fall within her alleged areas of expertise. The court does not comprehend how expertise in discrimination and race relations qualifies Dr. Jones to analyze a survey instrument. Similarly, Dr. Kallen's only given qualification is that he is an MSU professor—professor of what, he doesn't say, nor does he say how he is qualified to analyze a survey.

14. Attachments 3 and 4 to Brady's responsive brief are identified as two letters authored by Todd Simon. Attachment 3, a letter to Brady dated August 1, 1988, gives a detailed explanation of the UCFA's recommendation. Attachment 4, a letter to Dr. Lou Anna K. Simon dated August 2, 1988, clearly states that "[t]he survey supported [the committee's] conclusion; it did not form it."

Brady also alleged in her first amended complaint that attempts by her to reduce the number of grievances she handled as FGO resulted in "public complaints" by grievants. (AC ¶ 33). The court is not entirely certain of the intended meaning of this allegation, but it goes without saying that if faculty members did indeed complain publicly about the FGO office during her term, this would hardly support a conclusion that she was perceived positively by all faculty members who had contact with her.

hend the defendants' burden in responding to a prima facie showing of discrimination under Title VII. The defendants need not give reasons for her nonreappointment which would be sufficient cause to discharge her from her tenured position as a University faculty member. Moreover, they need not show that their decision-making process could withstand scientific scrutiny, or that it comported with sound personnel practices or due process. They need only articulate a legitimate nondiscriminatory reason for their action. While Brady may understandably be upset that the UCFA chose to hold her up to the very public scrutiny of a peer survey, the aim of discrimination laws is not to provide a remedy for insensitive treatment.

The court concludes that Brady has failed to make a prima facie showing of race and gender discrimination and has failed to rebut the defendants' legitimate nondiscriminatory reason for her nonreappointment. Accordingly, summary judgment is GRANTED dismissing with prejudice her remaining claims of race and gender discrimination under Title VII.

The defendants have in passing suggested that the court, on its own initiative, impose sanctions against Brady under Fed. R.Civ.P. 11, for submitting untimely, unverified affidavits and for making certain factual statements in her brief which are unsubstantiated by affidavit or otherwise. The court, however, declines to impose sanctions in the absence of a specific motion by the defendants.

IT IS SO ORDERED.