**Tom LACHMUND, Plaintiff,**

v.

**ADM INVESTOR SERVICES, INC., a Delaware corporation, A/C Trading Company, an Indiana general partnership d/b/a A/C Trading 2000, and Demeter, Inc., an Indiana corporation, Defendants.**

**DEMETER, INC., Counterclaimant,**

v.

**Tom LACHMUND, Counterdefendant.**

**No. 2:97CV92.**

United States District Court,
N.D. Indiana,
Hammond Division.

Sept. 24, 1998.

Joel J. Bellows, Laurel G. Bellows, Nicholas P. Iavarone, Rebecca J. Wing, Christopher L. Gallinari, Bellows and Bellows, Chicago, IL, for Tom Lachmund.

Timothy C. Klenk, Richard J. Rappaport, Alison C. B. Laing, Amy Beth Manning, Ross and Hardie, Chicago, IL, for ADM Investor Services, Inc.

Jeffry Mark Henderson, Mark M. Lyman, Henry Karl Becker, Daniel G. Dolan, Jr., John D. Ruark, Patrick Gerard King, Henderson Becker and Lyman, Chicago, IL, for A/C Trading Co.

Stephen L. Fink, Mark A. Garvin, Thomas C. Kus, Barnes and Thornburg, Fort Wayne, IN, for Demeter, Inc.

Joel J. Bellows, Laurel G. Bellows, Nicholas P. Iavarone, Rebecca J. Wing, Christopher L. Gallinari, Bellows and Bellows, Chicago, IL, for Tom Lachmund.

## ORDER

MOODY, District Judge.

Before the court are the motions to dismiss of defendant A/C Trading Company ("A/C") and defendant ADM Investor Services, Inc. ("ADMIS").[1] The motions put forth numerous arguments for the proposition that plaintiff Tom Lachmund ("Lachmund") has failed to state claims against A/C and ADMIS pertaining to certain grain contracts entered into by Lachmund. Because many of the arguments put forth by A/C overlap with those put forth by ADMIS, the court will address the motions together, one issue at a time. Ultimately the court finds that the motions to dismiss must be **GRANTED** as to Lachmund's federal claims, and that the remainder of his claims are more appropriately addressed in state court. Accordingly, this case is **DISMISSED.**

### FACTS

This case was transferred to the Northern District of Indiana from the Northern District of Illinois under the doctrine of forum non conveniens. *See* 28 U.S.C. § 1404(a). The facts found by Judge Marovich constitute a sufficient backdrop to these motions to dismiss, and as those facts are not the subject of any dispute, the court repeats them more or less verbatim here. Further facts will be noted in the court's analysis below where they pertain to a particular legal controversy between the parties.

ADMIS is a Delaware corporation registered with the Commodity Futures Trading Commission ("CFTC") as a Futures Commission Merchant ("FCM"). A/C is an Indiana general partnership run by Alvin Fischbach ("Fischbach") and Chalmer Miller ("Miller") and registered with the CFTC as both a Commodity Trading Advisor ("CTA") and an Introducing Broker ("IB"). As an IB, A/C lawfully may solicit commodity customer ac-

---

1. The court **GRANTS** defendant ADMIS's motion for leave to file instanter a reply memo in excess of 15 pages.

counts and may introduce those accounts to an FCM such as ADMIS. ADMIS executed a written Guarantee Agreement on behalf of A/C, pursuant to which ADMIS guaranteed the performance of, and agreed to be jointly and severally liable for, all obligations of A/C under the Commodity Exchange Act and the rules and regulations promulgated thereunder.

A/C Trading 2000 ("A/C 2000") is an Indiana general partnership, run by James Gerlach ("Gerlach"), Fischbach and Miller, which is engaged in the business of agricultural consulting. A/C 2000 is not registered as an IB and is not a party to the Guarantee Agreement between A/C and ADMIS. Defendant Demeter, Inc. ("Demeter") is an Indiana corporation operating a grain elevator. Plaintiff Lachmund is an Indiana farmer.

In February 1996, Lachmund entered into a consulting agreement with A/C 2000. Around that same time, he opened a commodity futures trading account with ADMIS. From February to June 1996, Lachmund further entered into a series of hybrid grain contracts with Demeter. Lachmund believes that ADMIS, A/C, and Demeter fraudulently induced him into entering into these agreements.

Lachmund brought this action pursuant to the Commodity Exchange Act ("CEA"), 7 U.S.C. § 1, *et seq.*, the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*, and state law, alleging a conspiracy of fraudulent activity with regard to his hybrid grain contracts with Demeter. He claims that defendants ADMIS, A/C, and Demeter misrepresented to him the risks associated with the grain contracts in a conspiracy to circumvent certain requirements of the CFTC, the Securities Exchange Commission ("SEC"), and the Chicago Board of Trade ("CBOT") with regard to the trading of commodity futures and/or trade options.

A/C and ADMIS maintain that Lachmund's amended complaint is insufficient to plead common-law fraud and, as such, fraud underlies his RICO and CEA claims, those claims are likewise insufficient. ADMIS further argues that Lachmund's amended complaint is insufficient to plead any

agency relationship between ADMIS or A/C, on the one hand, and A/C 2000, on the other. Without a sufficient charge of agency, ADMIS argues that Lachmund cannot proceed against ADMIS and A/C. Both ADMIS and A/C finally contend that Lachmund's amended complaint is insufficient to plead damages, which are necessary to his action.

### STANDARD OF REVIEW

When deciding a motion to dismiss filed pursuant to FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6), the court will construe the allegations of the plaintiff liberally, i.e., "in the light most favorable" to him. *Resolution Trust Corp. v. O'Bear, Overholser, Smith & Huffer,* 840 F.Supp. 1270, 1274 (N.D.Ind. 1993). The court will not dismiss the case "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). While the factual averments in the complaint must be accepted as true, the court "need not accept as true legal conclusions or unwarranted factual inferences." *LRL Properties v. Portage Metro Hous. Auth.,* 55 F.3d 1097, 1103 (6th Cir.1995) (quoting *Morgan v. Church's Fried Chicken,* 829 F.2d 10, 12 (6th Cir.1987)); *see also Westcott v. City of Omaha,* 901 F.2d 1486, 1488 (8th Cir.1990); 5 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1357, at 595–97 (1969).

### ANALYSIS

*I. Sufficiency of Lachmund's amended complaint with regard to his common-law fraud claim*

Lachmund's common-law fraud claim (Count 9) must fail, according to A/C and ADMIS, because Lachmund has not pleaded fraud with sufficient particularity as required by FEDERAL RULE OF CIVIL PROCEDURE 9(b), and because tort claims are unavailable to him under the economic loss doctrine.

#### A. RULE 9(b)

RULE 9(b) states:

**Fraud, Mistake, Condition of the Mind.** In all averments of fraud or mistake, the circumstances constituting the fraud or mistake shall be stated with particularity.

Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

This court found Lachmund's original complaint to be insufficient under RULE 9(b), but allowed him to file an amended complaint. *See* Court's Order of August 15, 1997. The court explained at that time that RULE 9(b) "requir[es] substantially more specificity than the general notice pleading doctrine requires under FEDERAL RULE OF CIVIL PROCEDURE 8. As the [Seventh Circuit Court of Appeals] stated in the *Uni\*Quality* case, when fraud is alleged, the plaintiff's complaint must include 'the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff.'" Order of August 15, 1997, at 2 (quoting *Uni\*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 923 (7th Cir.1992); *see also Vicom, Inc. v. Harbridge Merchant Servs., Inc.*, 20 F.3d 771, 777 (7th Cir.1994). The court found that Lachmund's complaint referred only generally to "the conspirators," failing to "get specific with regard to the alleged misrepresentations ... [or] to attribute certain misrepresentations to specific defendants." Order of August 15, 1997, at 3.

Lachmund has filed an amended complaint and an amendment to his amended complaint, and yet A/C and ADMIS still maintain that Lachmund's allegations of fraud are insufficient. While much of Lachmund's amended complaint is the same as his original complaint, Lachmund did add more specific allegations in ¶¶ 33–59. In those paragraphs, which are realleged in each count of Lachmund's complaint, Lachmund describes a series of agreements he entered into at the behest of Gerlach. Gerlach worked for Demeter at the time of Lachmund's 1994 harvest. *See* Complaint ¶ 33. Demeter usually received Lachmund's grain crop, and therefore it was familiar with Lachmund's average yield per year. *See id.* After the 1994 harvest, Gerlach told Lachmund that he (Gerlach) was leaving Demeter to start his own company. *See id.* ¶ 34. Lachmund expressed interest in doing business with Gerlach's new company in the future.[2] *See id.*

At the beginning of 1995, Gerlach met Lachmund at Lachmund's home and explained the new business's "program." *See id.* ¶¶ 35–36. The program included Gerlach entering into contracts with Demeter for the sale of grain on Lachmund's behalf. *See id.* ¶ 36. Gerlach also recommended purchasing options "to protect against the risk of a negative difference between the contract prices and the subsequent cash market prices at time of delivery." *See id.* Lachmund agreed to enter into Gerlach's "contracts and options" program, and opened a regulated commodity futures and options trading account with ADMIS as instructed by Gerlach. *See id.* ¶ 37.

According to Lachmund, Gerlach failed to inform him of several material facts regarding the contracts and options program. Gerlach failed to explain the speculative risk of a "new crop/old crop spread," which was bound to arise under Gerlach's plan. *See id.* ¶ 39. Gerlach failed to explain that contracts entered into with Demeter would account for 100% of Lachmund's expected yield each year, so that any shortcoming would have to be rolled into the next year "at the risk of unlimited liability for inverse crop year spreads." *Id.* Gerlach falsely told Lachmund that "the only risk in the program was that of a difference in price within any one given crop year which could be hedged against by the purchase of options." *Id.*

Needless to say, the program did not work as Lachmund had expected in the years to come. Gerlach negotiated several contracts with Demeter on Lachmund's behalf, which Lachmund signed, for the sale of Lachmund's estimated annual yield of grain. Each year Lachmund came up short and the shortcoming rolled into the next year. In the third year, Demeter informed Lachmund that it would no longer roll its contracts

---

**2.** A/C states that this portion of Lachmund's complaint reveals that "Plaintiff knew that Gerlach was forming a new legal entity (A/C 2000) separate and distinct from A/C." A/C's Memorandum in Support of Motion to Dismiss at 2. This is an inaccurate description of the complaint,

which reveals only that Lachmund knew that Gerlach was leaving Demeter. The complaint shows no knowledge on the part of Lachmund regarding any legal distinction between A/C and A/C 2000.

beyond the end of each year, "and that Demeter from that moment forward would require delivery of actual grain or payment in cash for all bushels committed under contracts." *Id.* ¶ 56. Lachmund protested what he considered to be a breach of contract, but Demeter proceeded to charge Lachmund's account with a total debit of $304,597.26, giving rise in part to this law suit.

Meanwhile, on the "options" side of Gerlach's program, Lachmund's ADMIS account failed to buffer the large losses resulting from Lachmund's contracts (not to mention the amounts paid to Gerlach's business, A/C 2000, for its expert marketing advice). In 1995, Gerlach bought off-exchange options directly from Demeter on Lachmund's behalf, apparently leaving Lachmund's ADMIS account idle. *See id.* ¶ 44. Gerlach told Lachmund that "the options to protect against the limited price risk were more expensive than usual and that if Gerlach waited until 1996 to purchase those options, the fees associated with such sales would be lower." *Id.* ¶ 51.

The next year, in 1996, "Gerlach recommended the options transactions entered in Lachmund's ADM[IS] commodity account, which were therefore entered in such account upon Gerlach's advice and recommendations." *Id.* ¶ 55. There is no indication in the amended complaint or in Exhibit H, a copy of activity in Lachmund's ADMIS account, that Gerlach ever dealt directly with ADMIS on Lachmund's behalf. Instead, it appears that Lachmund himself entered into options transactions using his ADMIS account, albeit under the influence of Gerlach. At any rate, the options transactions were unsuccessful in hedging the risks inherent in the Demeter contracts, as evidenced by Demeter's very pricey demand.

Lachmund maintains that, "[h]ad Defendants informed Plaintiff of the actual nature of these contracts and of the actual risks associated with such contracts and of the information herein previously alleged that was not disclosed to him, Plaintiff would not have entered into any of the contracts ... nor would he have made any payments under as of said contracts nor would he have opened a commodity trading account with ADM[IS]." *Id.* ¶ 59.

The parties do not dispute that the "new business" started by Gerlach was in fact A/C 2000, and that Lachmund has now sufficiently pleaded fraud against A/C 2000 based upon Gerlach's alleged misrepresentations. In other words, there appears to be no dispute that Lachmund has sufficiently alleged "that a material representation of a past or existing fact was made which was untrue and known to be untrue by [A/C 2000], or else recklessly made, and that [Lachmund] did in fact rely on the representation and was induced thereby to act to his detriment." *Terre Haute Regional Hosp., Inc. v. Basden,* 524 N.E.2d 1306, 1310 (Ind.Ct.App.1988). Further, the court finds that RULE 9(b)'s requirement of particularity has been met with respect to the "identity of the person making the misrepresentation [Gerlach], the time, place, and content of the misrepresentation [1995–1996, at Lachmund's home, about the safety and security of Gerlach's contracts and options program], and the method by which the misrepresentation was communicated to the plaintiff [by telephone, by mail, and in person]."

The real dispute regarding Lachmund's amended complaint pertains not to the particularities of the alleged fraud, but to the legal ramifications of Gerlach's alleged fraudulent misrepresentations on the actual defendants in this case, which do not include A/C 2000 as distinct from A/C. Lachmund alleges that Gerlach's work for A/C 2000 made him the agent of A/C and ADMIS, but A/C and ADMIS attack the sufficiency of such agency allegations.

### 1. A/C

The amended complaint, like Lachmund's original complaint, combines A/C and A/C 2000 into one entity. Lachmund indicates simply, in the caption of his amended complaint, that he is suing A/C, which was *doing business as* A/C 2000. This is a legal conclusion, of course, and Lachmund cannot simply collapse A/C 2000 into A/C without alleging at least "a few facts which outline [his] claim." *Ghouth v. Conticommodity Serv., Inc.,* 642 F.Supp. 1325, 1328–29 (N.D.Ill.1986). *See also Rand Bond of N. Am., Inc. v. Saul Stone & Co.,* 726 F.Supp. 684, 687 (N.D.Ill.1989) ("'[A]gency is a legal

relationship whose existence flows from facts. And though federal practice involves a notice-pleading regime rather than the fact pleading demanded by Illinois courts ..., it remains incumbent on the pleader to allege some factual predicate (even though generalized rather than evidentiary in nature) to create the inference contained in [the pleader's] bald 'agency' assertions."); *Salton/Maxim Housewares Group v. Comerica Bank Detroit,* No. 89 C 6207, 1990 WL 77538, at *5 (N.D.Ill. May 29, 1990) (facts needed to support agency relationship in complaint).

In *Ghouth,* a motion to dismiss was granted where the plaintiff alleged in his complaint, without any facts to support the allegation, that one of the defendants was the successor-in-interest of another defendant in the case. Judge Coar in the Northern District of Illinois followed the *Ghouth* rationale in dismissing a complaint that baldly asserted that a defendant was "doing business as" a certain company, and that the company in question had defrauded him. *See Unity House, Inc. v. First Commercial Fin. Group, et al.,* No. 96 C 1716, 1997 WL 282725, at *2–*3 (N.D.Ill. May 19, 1997). Because there was "no allegation (except the unsupported statement that defendant Pringle was doing business as A & A) that actually links [Pringle] to A & A or to the actions or omissions alleged in the complaint," Judge Coar dismissed Pringle from the case. *Id.* at *3.

A/C believes that the *Ghouth* and *Unity House* decisions should be followed by this court, and that those cases mandate the dismissal of A/C because the fraudulent acts and omissions of Gerlach are linked only in conclusory fashion to A/C. The court disagrees. Fischbach and Miller, the two general partners of A/C, are incidentally general partners of A/C 2000 as well. So far as the complaint reflects, the only difference in the management of the two companies is the addition of Gerlach as a general partner in A/C 2000. In addition, Lachmund states that Gerlach gave him promotional information from both A/C and A/C 2000, and that Gerlach worked out of an office shared by the two companies.

These facts are enough, in the court's mind, to distinguish the present case from *Ghouth* and *Unity House* and to satisfy the liberal pleading requirements of the federal rules. The court finds it plausible that some sets of facts consistent with those alleged by Lachmund would indicate that A/C held Gerlach out as its agent. While the evidence may not ultimately bear out the amended complaint's allegations that the two companies were operating as a single entity with respect to Lachmund's grain contracts, it is premature to dismiss Lachmund's claim of common-law fraud against A/C on RULE 9(b) or RULE 12(b)(6) grounds.

### 2. ADMIS

■ The same reasoning does not apply to ADMIS, however. While Lachmund concludes in his amended complaint that Gerlach, A/C, and A/C 2000 worked as agents of ADMIS with respect to his trading account, he states only one fact that might support such a conclusion: ADMIS had a Guarantee Agreement with A/C in which ADMIS guaranteed the performance of, and agreed to be jointly and severally liable for, all obligations of A/C under the CEA.[3] The court admits that Lachmund's train of thought has intuitive appeal. If A/C was doing business as A/C 2000, and ADMIS has accepted liability for some of A/C's transactions, then ADMIS must also be liable for some of A/C 2000's transactions.

■ Without more facts tying ADMIS to Gerlach or to A/C or A/C 2000, however, the law rejects this approach. An FCM is not generally liable for fraud perpetrated by an IB at the expense of the IB's customer. *See Katz v. Financial Clearing & Servs. Corp.,* 794 F.Supp. 88, 94 (S.D.N.Y.1992) ("An introducing broker is not acting as an agent of the clearing broker when the introducing broker makes fraudulent misrepresentations to its customers."). It is unclear what additional facts might support an agency claim such that the FCM would be liable for the fraud of an IB. The *Katz* court indicated that facts alleging a close working relationship between the FCM and the IB, such that the FCM was

---

**3.** The terms and forms of such guarantee agreements are specifically mandated in CFTC Form 1–FR–IB (Part B). *See Cunningham v. Waters Tan & Co.,* 65 F.3d 1351, 1353 n. 2 (7th Cir. 1995). The form itself does not describe an agency relationship.

involved in supervising the daily operations of the IB, would support a claim of fraud against the FCM. *See id.* (citing *Faturik v. Woodmere Sec., Inc.,* 431 F.Supp. 894, 896–97 (S.D.N.Y.1977)).

■ The CFTC has declined to find that guarantee agreements between IBs and FCMs, without more, are indicative of agency relationships. *See Violette v. First Options of Chicago, Inc.,* No. 95–R128, Comm. Fut. L. Rep. (CCH) ¶ 26,951, 1997 WL 71438, at *3 (CFTC Feb. 20, 1997), ADMIS's Memorandum in Support of Motion to Dismiss, Ex. 12 at *6–*7 ("The Commission has never held that status as a guaranteed IB, standing alone, is sufficient to establish agency."). This is particularly true when the alleged fraudulent activity is undertaken by the IB as a "venture" distinct from its relationship with the FCM. *See Cunningham v. Waters Tan & Co.,* 65 F.3d 1351, 1359 (7th Cir.1995) ("[FCM], by entering into a guarantee agreement with [IB] as an individual, never agreed to guarantee [IB's] other venture as a commodity pool operator—an activity of which [FCM] was never made aware.").

Lachmund has utterly failed to plead any facts that might indicate that ADMIS knew of Lachmund's grain contracts, that it cloaked Gerlach, A/C, or A/C 2000 with the actual or apparent authority to act on AD-MIS's behalf with regard to such contracts, or that it encouraged Gerlach, A/C, or A/C 2000 to act on its behalf with regard to *any* futures transactions. It is not even clear to the court how ADMIS is supposed to have benefitted by the opening of Lachmund's account or by the one trade conducted through that account. ADMIS did not share a business name similar to those with whom Lachmund dealt. ADMIS did not share a business address identical to those with whom Lachmund dealt. ADMIS did not distribute any type of promotional material through those with whom Lachmund dealt. A/C 2000 was a new business venture which may have been linked to A/C, but Lachmund alleges nothing to indicate that A/C's knowledge of or participation in A/C 2000's activities was linked to A/C's guaranteed IB status with ADMIS.

Unlike A/C, there is not a single factual allegation in Lachmund's complaint that supports the proposition that ADMIS encour-

aged Lachmund or anyone to deal with Gerlach, A/C, or A/C 2000 on its behalf, for any kind of transactions. The entirety of Lachmund's common-law fraud claim against ADMIS rests on his legal conclusion that Gerlach was the agent of ADMIS because ADMIS entered into a Guarantee Agreement with A/C. Even under the liberal pleading requirements of the federal rules, this is not a sufficient allegation of agency. Accordingly, ADMIS's motion to dismiss Lachmund's common-law fraud claim is **GRANTED.**

### B. Economic loss doctrine

■ A/C and ADMIS make the alternative argument that Lachmund must be barred from pursuing his common-law fraud claim by the economic loss doctrine. The Supreme Court of Minnesota describes the doctrine in this way: "[E]conomic losses that arise out of commercial transactions, except those involving personal injury or damage to other property, are not recoverable under the tort theories of negligence or strict products liability." *Superwood Corp. v. Siempelkamp Corp.,* 311 N.W.2d 159, 162 (Minn.1981). The economic loss doctrine prevents the circumvention of the Uniform Commercial Code ("UCC") by plaintiffs pursuing tort claims for what would otherwise amount to a breach of contract between merchants of goods. The United States District Court for Minnesota followed the economic loss doctrine to dismiss a fraud claim based on facts similar to those presented here, finding that a farmer was limited to UCC remedies for any economic damages he suffered through a hybrid grain contract with a grain elevator. *See In re Grain Land Coop Cases,* 978 F.Supp. 1267, 1279 (D.Minn. 1997).

Because the court ultimately dismisses Lachmund's federal claims below and because the court declines to retain supplemental jurisdiction over Lachmund's remaining state claims, the court finds it best not to speculate on the applicability of the economic loss doctrine to Indiana tort claims.

### II. Sufficiency of Lachmund's amended complaint with regard to his RICO claims

■ In Count 1, Lachmund alleges a

violation of 18 U.S.C. § 1962(c) by ADMIS.[4] The elements of a RICO violation under § 1962(c) consist of the direct or indirect participation in the "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Midwest Grinding Co., Inc. v. Spitz*, 976 F.2d 1016, 1019 (7th Cir. 1992). Lachmund alleges that ADMIS participated in the conduct of an illegal securities fraud both indirectly, through its agents A/C, A/C 2000, and Gerlach, and directly, through certain fraudulent mailings and phone calls. The court notes first that, because it found Lachmund's agency allegations insufficient against ADMIS for the purpose of his state-law fraud claim, his claim (if indeed he is attempting to make it) that ADMIS violated § 1962(c) indirectly through the use of any agents must likewise fail.

■■■ As for any direct participation on the part of ADMIS that might violate § 1962(c), Lachmund has failed to amend his complaint to meet the dictates of RULE 9(b). RULE 9(b) is of course applicable to allegations of fraud in a civil RICO complaint. *See Vicom, Inc. v. Harbridge Merchant Servs., Inc.*, 20 F.3d 771, 777 (7th Cir.1994); *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1020 (7th Cir.1992). As explained above, this means that a plaintiff is bound to, "at a minimum, describe the predicate acts [of fraud] with some specificity and state the time, place, and content of the alleged communications perpetrating the fraud." *Midwest Grinding Co.*, 976 F.2d at 1020. Particularly in a multiple defendant case, "RULE 9(b) requires a RICO plaintiff to plead sufficient facts to notify each defendant of his alleged participation in the scheme." *Vicom*, 20 F.3d at 778.

In this case, the only direct participation of ADMIS in the securities fraud is alleged as follows:

58. ADM[IS] sent confirmations, monthly statements and other commodity futures contracts purchased through the mail and sold on the CBOT to offset the various HTA and other hybrid grain contracts solicited by ... A/C ... and Demeter. ADM[IS] through its co-conspirator agents used the mails to entice farmers other than Plaintiff to attend various 'presentations' intended to lure them into this fraudulent scheme.

. . .

61. ADM[IS] made use of interstate telephone transmission lines to effectuate the commodity futures contracts purchased and sold on the CBOT to offset the various hybrid grain contracts solicited by ... A/C ... and Demeter. In addition, ADM[IS] caused the use of interstate telephone lines by A/C and Demeter to solicit hedge-to-arrive and other hybrid grain contracts with Plaintiff.

Lachmund's Amended Complaint ¶¶ 58, 61.

■■■ These allegations, as Lachmund is already well aware, do not meet the heightened pleading standards of RULE 9(b). *See Jepson Inc. v. Makita Corp.*, 34 F.3d 1321, 1328 (7th Cir.1994) ("[L]oose references to mailings and telephone calls in furtherance of a purported scheme to defraud will not do.") (quotation omitted). In addition, the court declines to let discovery go forward with the idea that information regarding specific acts of ADMIS employees or agents may be discovered to support a RICO claim. The court is satisfied that "[Rule 9(b)'s] requirement of greater specificity is intended to protect defendants from the harm that results from charges of serious wrongdoing, and to give defendants notice of the conduct complained of. Complaints alleging fraud should seek redress for a wrong, rather than attempt to discover unknown wrongs." *Berent v. Kemper Corp.*, 780 F.Supp. 431, 448–449 (E.D.Mich.1991) (quoting *NL Indus. Inc. v. Gulf & Western Industries, Inc.*, 650 F.Supp. 1115, 1129–30 (D.Kan.1986)).

■■■ In Count 2, Lachmund alleges violations of 18 U.S.C. § 1962(d) by A/C and ADMIS.[5] In a recent Supreme Court case,

---

4. This section states: "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c).

5. This section states: "It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d).

the Court addressed the scope of RICO's conspiracy provision by noting the well-established principles of conspiracy law:

(1) an individual can be convicted of a conspiracy even if he "does not agree to commit or facilitate every part of the substantive offense"; (2) an individual who agrees with others to pursue a shared criminal objective may be held liable for the acts of the other conspirators; (3) such an individual may be held liable for the conspiracy even if he does not perpetrate the crime himself but provides support to those who do; and (4) an individual may be held liable for a conspiracy "even though he was incapable of committing the substantive offense."

*Goren v. New Vision Int'l,* No. 97–3785, 156 F.3d 721, 731, 1998 WL 557579, at *7 (7th Cir. Sept.2, 1998) (quoting *Salinas v. United States,* 522 U.S. 52, 118 S.Ct. 469, 476–77, 139 L.Ed.2d 352 (1997)).

 The Seventh Circuit Court of Appeals interprets § 1962(d) broadly, but has cautioned that "the broad construction of the RICO conspiracy provision should not be used by the courts 'to criminalize mere association with an enterprise.' " *Id.* at 731–32, 1998 WL at *8 (quoting *United States v. Neapolitan,* 791 F.2d 489, 498 (7th Cir.), *cert. denied,* 479 U.S. 940, 107 S.Ct. 422, 93 L.Ed.2d 372 (1986)). Instead, courts must look for an actual "agreement to participate in an endeavor which, if completed, would constitute a violation of the substantive statute." *Id.* (citing *Gagan v. American Cablevision, Inc.,* 77 F.3d 951, 960 (7th Cir.1996); *Schiffels v. Kemper Fin. Servs., Inc.,* 978 F.2d 344, 348 (7th Cir.1992)). A complaint is inadequate, therefore, if it does not adequately allege that the defendants agreed "to the objective of a violation of RICO." *Id.* For practical purposes, such an agreement actually consists of two separate agreements: (1) an agreement "to maintain an interest in or control of an enterprise or to participate in the affairs of an enterprise through a pattern of racketeering activity"; and (2) an agreement that someone would "commit at least two predicate acts" in furtherance of the enterprise's illegal goals. *Id.* at 732, 1998 WL at *9.

In *Goren,* the Court of Appeals upheld the dismissal of the plaintiff's complaint in part because the complaint provided no details "as to the roles played by the individual[s]," or as to any agreement between the individuals regarding what role each of them would play. *Id.* Instead, the plaintiff generally alleged actions on behalf of "the conspirators" without alleging specifically the agreement of each conspirator to participate. Similarly, Lachmund's Count 2 alleges the following:

57. As set forth in the facts herein previously alleged, ADM ... and A/C in violation of 18 U.S.C. § 1962(d), entered into a conspiracy to commit mail and wire fraud as a means of participating in the affairs of ... Demeter, the CBOT and Plaintiff's farming operation, through a pattern of racketeering activity ....

Lachmund's Amended Complaint ¶ 57.

 "The facts previously alleged," however, do not support conspiracy allegations against ADMIS and A/C. There is not a single allegation in the amended complaint indicating that ADMIS had any idea whatsoever that Gerlach had fraudulently induced Lachmund to enter into contracts with Demeter and to make a trade in an ADMIS account. In addition, while there may be sufficient allegations that A/C knew what was happening with respect to Lachmund, and even participated in a fraud against him through some control over Gerlach and A/C 2000, there is not a single allegation that supports an agreement between A/C and anyone else. It must be remembered that Lachmund has alleged that A/C and A/C 2000 are a single entity, or have at least operated as a single entity with regard to his claims. It is simply impossible to conspire with oneself or to make any agreement whatsoever with oneself. *See generally Fitzgerald v. Chrysler Corp.,* 116 F.3d 225, 227 (7th Cir.1997) ("What we cannot imagine, and what we do not find any support for in appellate case law, is applying RICO to a free-standing corporation ... merely because [the corporation] does business through agents, as virtually every manufacturer does."). There is no indication in Lachmund's amended complaint that A/C ever specifically agreed with ADMIS or with any of the other entities mentioned by La-

chmund. Accordingly, Lachmund's § 1962(d) claim is clearly insufficient.

Finally, in Count 3, Lachmund alleges violations of 18 U.S.C. § 1962(a) by A/C and ADMIS.[6] For the reasons set forth above, the court finds that this claim is insufficient. All of Lachmund's RICO claims, therefore, fail under RULE 9(b), and they are therefore **DISMISSED.**

### III. Sufficiency of Lachmund's amended complaint with regard to his CEA claim

▇▇▇ Lachmund's CEA claim (Count 4) is premised on the legal conclusion that the grain contracts between him and Demeter, negotiated by Gerlach, were off-exchange futures contracts. As such, they violated the CEA and various federal regulations, and Lachmund seeks to hold all three defendants (A/C, ADMIS, and Demeter) liable for the violations. Contracts for the sale of a commodity for future delivery, referred to as "futures contracts," are regulated by the CEA, with one important exception:

> The term "future delivery" does not include any sale of any cash commodity for deferred shipment or delivery.

7 U.S.C. § 1a(11). The exemption would appear to swallow the rule, but has been traced to an exemption in the Futures Trading Act of 1921, Pub.L. No. 67–66, § 2, 42 Stat. 187 (1921), which was clearly intended to protect the legitimate transactions of farmers and grain elevators from CFTC regulation. *See Commodity Futures Trading Com'n v. Co Petro Mktg. Group, Inc.,* 680 F.2d 573, 577 & n. 4 (9th Cir.1982) (quoting Senate and House reports) (Futures Trading Act excluded "any sale of cash grain for deferred shipment and delivery"); *In re Grain Land Coop Cases,* 978 F.Supp. 1267, 1273 (D.Minn.1997).

▇▇▇ The distinction between regulated "futures contracts" and excluded "cash forward contracts" is vital to this case. In classifying a contract as one or the other, courts do not have the benefit of a "bright-line definition or list of characterizing elements .... The transaction must be viewed as a whole with a critical eye toward its underlying purpose." *Co Petro Mktg. Group, Inc.,* 680 F.2d at 581. While the court is mindful of the fact that such a broad assessment ordinarily should be made only after the parties have presented discovery materials to the court, it is clear in the present case that the grain contracts between Lachmund and Demeter were cash forward contracts excluded from the CEA.

▇▇▇ "[F]utures contracts are undertaken principally to assume or shift price risk without transferring the underlying commodity." *See In re Stovall,* Commodity Futures Trading Commission, CFTC 75–7, 1979 WL 11475 (Dec. 6, 1979); *see also Co Petro Mktg. Group, Inc.,* 680 F.2d at 578–79 (futures contracts "speculative" in nature; buyer has no actual interest in the commodity and does not have the actual capacity to receive the contract goods). On the other hand, "a cash forward contract is one in which the parties contemplate physical transfer of the actual commodity." *CFTC v. Noble Metals Int'l, Inc.,* 67 F.3d 766, 772 (9th Cir.1995), *cert. denied,* —— U.S. ——, 117 S.Ct. 64, 136 L.Ed.2d 26 (1996) (quoting *Co Petro Mktg. Group, Inc.,* 680 F.2d at 578). The classic example of the cash forward contract, exempt from the CEA, is the farmer contracting to sell part of his next year's crop to a grain elevator, at a price decided in advance:

> There is no indication that Congress drew this exclusion otherwise than to meet a particular need such as that of a farmer to sell part of next season's harvest at a set price to a grain elevator or miller. These cash forward contracts guarantee the farmer a buyer for his crop and provide the buyer with an assured price. Most important, both parties to contracts deal in and contemplate future delivery of the actual grain.

---

**6.** This section states: "It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

*Petro Mktg. Group, Inc.,* 680 F.2d at 577–78. *See also In re Grain Land Coop Cases,* 978 F.Supp. at 1273 (contracts for actual delivery of grain in exchange for money, entered into between producers and resellers of grain, "exemplify what Congress intended to exclude from the CEA").

In the present case, no matter what label Lachmund might use, the court finds that the grain contracts were cash forward contracts as a matter of law. The contracts were between a farmer and a grain elevator, both in the business of selling grain. Lachmund actually produced and delivered grain to Demeter, and does not argue that his intentions or Demeter's intentions were purely speculative. The contracts entered into were not identical "form" contracts offered to the public at large, but were specifically negotiated with Gerlach, who acted as Lachmund's representative. This is a classic cash forward contract case regardless of the "rollover" options, because the real essence of the parties' intentions—the very reason they sought each other out—was to physically exchange crops for money. As such, the contracts in question are exempt from the CEA even though, in retrospect, they were quite unwise. Lachmund's CEA claim must be **DISMISSED.** *See Bunker v. Farmers Elevator Co. of Hopkins,* No. 97–0137–CV–W–SOW (W.D.Mo. Sept. 18, 1997) (dismissing case involving contract between farmer and grain elevator for sale of grain with roll-over provision; contract exempt from the CEA as a cash forward contract and therefore the federal district court had no jurisdiction).[7]

*CONCLUSION*

For the foregoing reasons, A/C's motion to dismiss is **GRANTED** and ADMIS's motion to dismiss is similarly **GRANTED.** All federal claims asserted by Lachmund against A/C, ADMIS, and Demeter are hereby **DISMISSED WITH PREJUDICE.** In addition, the common-law fraud claim asserted by Lachmund against ADMIS is **DISMISSED WITH PREJUDICE.** The court declines to exercise supplemental jurisdiction over the remaining state-law claims and counterclaim, which are all **DISMISSED WITHOUT PREJUDICE.**[8] All pending motions in this case are **DENIED AS MOOT.**

**SO ORDERED.**

---

**7.** The court does not need to pass on ADMIS's contention that Lachmund lacks standing to bring his CEA claim.

**8.** The court finds that Lachmund had ample notice of the deficiencies in his complaint, which he has already amended, and therefore declines to give him another opportunity to state his federal claims. *See Midwest Grinding Co., Inc. v. Spitz,* 976 F.2d 1016, 1020 (7th Cir.1992).